**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SATHEESKUMAR ANNACHAMY, AKA
Sathees Annachamy,

*Petitioner*,

v.

ERIC H. HOLDER, JR., Attorney
General,

*Respondent*.

No. 07-70336

Agency No.
A200-041-850

ORDER AND
AMENDED
OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
September 2, 2011—San Francisco, California

Filed July 3, 2012
Amended August 19, 2013

Before: Raymond C. Fisher and Johnnie B. Rawlinson,
Circuit Judges, and Richard Mills, District Judge.[*]

Opinion by Judge Fisher

---

[*] The Honorable Richard Mills, Senior United States District Judge for
the Central District of Illinois, sitting by designation.

## SUMMARY[**]

### Immigration

The panel amended its opinion filed on July 3, 2012; granted a petition for rehearing; denied a petition for rehearing en banc on behalf of the court; and ordered that no future petitions will be entertained.

The panel denied a petition for review of the Board of Immigration Appeals' denial of asylum and withholding of removal based on the material support terrorist provision of 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). The panel held that the material support bar does not include an implied exception for individuals who assist organizations engaged in legitimate political violence or who provide support under duress.

In the amended opinion, the panel added a statement that because Congress updated the totalitarian party membership provision in the same legislation in which it created the material support bar, it was appropriate to presume that Congress was aware of the existing legislation. The panel also added a statement that the waiver provision is still relevant in determining earlier congressional intent, even though the waiver provision was not enacted until 15 years after the creation of the material support bar.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Visuvanathan Rudrakumaran, Law Office of Visuvanathan Rudrakumaran (argued), New York, New York, for Petitioner.

Tony West, Assistant Attorney General, United States Department of Justice; Michael P. Lindemann, Assistant Director; Ethan B. Kanter (argued), Senior Litigation Counsel, Office of Immigration Litigation, Washington, D.C., for Respondent.

Sean Riordan, ACLU of San Diego & Imperial Counties, San Diego, California, for Amici Curiae Harvard Immigration and Refugee Clinic and American Civil Liberties Union of San Diego & Imperial Counties.

## ORDER

The opinion filed July 3, 2012, and reported at 686 F.3d 729 (9th Cir. 2012), is amended. The amended opinion is filed concurrent with this Order.

With the amended opinion, the panel has voted to **GRANT** Petitioner's petition for rehearing. Judges Fisher and Rawlinson have voted to deny the suggestion for rehearing en banc and Judge Mills so recommends.

The full court has been advised of the suggestion for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

Petitioner's suggestion for rehearing en banc, filed September 14, 2012, is **DENIED**.

No future petitions for rehearing or rehearing en banc will be entertained.

---

**OPINION**

FISHER, Circuit Judge:

Satheeskumar Annachamy petitions for review of a decision of the Board of Immigration Appeals (BIA) denying him asylum and withholding of removal because he provided material support to a terrorist organization, in violation of 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). Annachamy argues that the BIA erred by applying the material support bar because (1) the organization he supported was engaged in legitimate political violence and (2) he provided support under duress. We hold that the material support bar does not include an implied exception for individuals who assist organizations engaged in legitimate political violence or who provide support under duress. We thus deny Annachamy's petition for review.

**I.**

Annachamy is a native and citizen of Sri Lanka. In a hearing before an immigration judge (IJ), Annachamy testified that between 1986 and 2004 he was arrested several times by the Sri Lankan army on suspicion that he was involved with the Liberation Tigers of Tamil Eelam (LTTE), a militant organization that was then at war with the Sri

Lankan government.[1]  Each time, the army detained him for many weeks, interrogated him and tortured him, including beating him with weapons while he was hung upside down, inserting a stick in his rectum, placing a bag soaked in gasoline over his head and forcibly submerging his head into water.

Annachamy testified that he was never a member of the LTTE and was opposed to it.  On several occasions, however, he was forced to assist LTTE members.  In 1992, for instance, LTTE members came to his house and demanded that he join them.  Annachamy refused and, upon threat of force, promised to give them money in the future.  In 1996, he paid LTTE members 2000 rupees (approximately $37).  On other occasions, LTTE members blindfolded Annachamy and took him to a LTTE camp, where they forced him to cook, dig trenches, fill sandbags and help build fences.  Each time he was taken to perform these activities, he was kept under strict watch and there was no possibility of escape.  Annachamy believed that he would have been killed if he tried to escape or seek help from the police.  He has had no contact with the LTTE since 1997, when he moved from his home town. Annachamy testified that he was not aware that the LTTE was considered a terrorist organization when he assisted them.

After being detained by the Sri Lankan army again in 2004, Annachamy went into hiding.  He left Sri Lanka and arrived in the United States in 2005.  Upon his arrival, the Immigration and Naturalization Service, now the Department of Homeland Security (DHS), initiated removal proceedings.

---

[1] Because both the IJ and BIA found that Annachamy was a credible witness, we assume his testimony was true.

Annachamy conceded that he was removable based on his unlawful presence in the United States, but filed an application for asylum, withholding of removal and protection under the Convention Against Torture (CAT).

After a hearing, an IJ granted Annachamy asylum and withholding of removal. The IJ found that, despite some inconsistencies, Annachamy testified in a credible manner. Relying on Annachamy's application, testimony and State Department reports on the conditions in Sri Lanka, the IJ found that Annachamy had demonstrated a well-founded fear of persecution based on a protected ground. The IJ also found that Annachamy was not precluded from obtaining relief even though he gave assistance to the LTTE, because he was forced to do so. The IJ found that Annachamy's "life or freedom would have been threatened" if he had not assisted the LTTE.

The BIA reversed. In an unpublished opinion, the BIA accepted the IJ's credibility determination and found that there was "no question" that Annachamy had established a well-founded fear of future persecution that went unrebutted. The BIA found, however, that the Immigration and Nationality Act (INA) barred Annachamy from obtaining asylum or withholding of removal because he had provided material support to a terrorist organization. The BIA instead granted Annachamy deferral of removal under CAT and remanded to the IJ to complete identity, law enforcement or security examinations required under 8 C.F.R.

§ 1003.1(d)(6).**[2]** Annachamy petitions for review of that decision.

## II.

We have jurisdiction to review the BIA's final order denying asylum and withholding of removal under 8 U.S.C. § 1252. *See Li*, 656 F.3d at 904 ("[W]here the BIA denies relief and remands pursuant to § 1003.1(d)(6) for background checks required for alternative relief, we have jurisdiction to consider an appeal of the final order denying relief."). "Our review is confined to the BIA's decision except to the extent the BIA incorporated the IJ's decision." *Id.* at 900–01. We review de novo constitutional and other questions of law. *See Khan v. Holder*, 584 F.3d 773, 776 (9th Cir. 2009). We afford the BIA's unpublished opinion *Skidmore* deference, meaning "we 'examine the validity of the BIA's reasoning, its thoroughness, and overall persuasiveness,' and give it weight accordingly." *United States v. Casasola*, 670 F.3d 1023, 1030 (9th Cir. 2012) (quoting *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1015 (9th Cir. 2006)).

---

**[2]** Before granting an application for relief or protection from removal, DHS must complete certain identity, law enforcement and security examinations. *See* 8 C.F.R. § 1003.47. Under 8 C.F.R. § 1003.1(d)(6), "[w]here background checks are required but have not yet been completed, the BIA must either issue an order remanding the case to the IJ with instructions to allow the DHS to complete the background checks, or provide notice to both parties that the case is on hold pending completion of the background checks." *Junming Li v. Holder*, 656 F.3d 898, 902 (9th Cir. 2011).

## III.

An alien who has engaged in terrorist activities is ineligible for asylum, withholding of removal and withholding under CAT, but remains eligible for deferral of removal under CAT. *See Haile v. Holder*, 658 F.3d 1122, 1125–26 (9th Cir. 2011).**[3]** We have previously recognized that the INA "defines 'engag[ing] in terrorist activity' broadly." *Khan*, 584 F.3d at 777 (alteration in original). The definition includes committing, planning or gathering information about potential targets for a terrorist activity, and soliciting funds or individuals for a terrorist activity or terrorist organization. *See* 8 U.S.C. § 1182(a)(3)(B)(iv). An alien also engages in terrorist activity by

> commit[ting] an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training —
>
> (aa) for the commission of a terrorist activity;

---

**[3]** *See also* 8 U.S.C. § 1182(a)(3)(B)(i)(I) (providing that an alien who has "engaged in terrorist activity" is inadmissible); *id.* § 1158(b)(2)(A)(v) (providing that an alien described in § 1182(a)(3)(B)(i)(I) is ineligible for asylum); *id.* §§ 1227(a)(4)(B), 1231(b)(3)(B)(iv) (same for withholding of removal); 8 C.F.R. § 1208.16(d)(2) (same for withholding under the CAT); 8 C.F.R. § 1208.17(a) (providing that an alien eligible for CAT protection but ineligible for CAT withholding shall be granted deferral of removal).

(bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

(cc) to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or

(dd) to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

*Id.* § 1182(a)(3)(B)(iv)(VI).

"The statute also defines 'terrorist organization' broadly." *Khan*, 584 F.3d at 777. The definition includes organizations designated as a "terrorist organization" by the Secretary of State, in consultation with the appropriate officials, *see* 8 U.S.C. § 1182(a)(3)(B)(vi)(I)–(II) — often referred to as Tier I and Tier II terrorist organizations — and any "group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, [terrorist activities]," *id.* § 1182(a)(3)(B)(vi)(III) — referred to as Tier III terrorist organizations.

Annachamy does not dispute that he materially assisted the LTTE, and the parties agree that the LTTE qualified as a

Tier III organization at the time he assisted it.[4]  Annachamy challenges the BIA's decision on two grounds, however.  He argues, first, that the material support bar does not apply to him because the LTTE was engaged in legitimate political violence; and, second, that the bar does not apply to him because he supported the LTTE under duress.  We consider each argument in turn.

### A.  Political Offense Exception.

Annachamy contends that the material support bar does not apply to him because the LTTE was engaged in "legitimate political violence."   Our decision in *Khan* forecloses this argument.  *See* 584 F.3d at 781–85.

In that case, the BIA found an alien ineligible for asylum and withholding of removal because he had engaged in terrorist activities by soliciting funds for a terrorist organization, in violation of 8 U.S.C. § 1182(a)(3)(B)(iv)(IV).  *See id.* at 776.  The alien argued on appeal that he did not assist a "terrorist organization" because "the definition of 'terrorist activity' under § 1182(a)(3)(B)(iii) incorporates international law, and thus excludes legitimate armed resistance against military targets." *Id.* at 781.  We rejected this argument because the plain language of the INA allowed for no such exception.  *See id.*

Annachamy advances the same argument we rejected in *Khan*, except he concedes the LTTE is a terrorist organization

---

[4] Annachamy does not argue that his support of the LTTE was not "material," so we need not resolve the issue of whether Annachamy's actions constitute "material support" of the LTTE within the meaning of the statute.

and thus that it engaged in terrorist activity. Rather than arguing there is a "political offense" exception to the definition of "terrorist activity," Annachamy would have us locate the exception in the material support bar. We decline to do so.

The material support bar provides that any alien who "commit[s] an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training" to a terrorist organization has engaged in terrorist activity. 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). Annachamy provides no textual hook for his argument that the material support bar does not apply to political offenses. He argues only that denying relief to aliens who have participated in political offenses would violate the United States' obligations under international law and would lead to troubling results, whereby, for instance, individuals who resisted the Nazis would be barred from obtaining asylum. We considered and rejected both of these arguments in *Khan*. *See* 584 F.3d at 781–84; *see also In re S-K-*, 23 I. & N. Dec. 936, 941 (B.I.A. 2006) ("[W]e find that Congress intentionally drafted the terrorist bars to relief very broadly, to include even those people described as 'freedom fighters,' and it did not intend to give us discretion to create exceptions for members of organizations to which our Government might be sympathetic."). We therefore hold that

there is no political offense exception to the material support bar.**[5]**

## B.  Duress Exception.

Annachamy also argues that he is not barred from obtaining asylum or withholding of removal because the material support bar does not apply to aliens who supported terrorist activities or organizations under duress.  We do not believe that is a permissible reading of the statute.

We begin with the text of the statute.  Notably, the material support bar itself does not provide an exception for material support that is involuntary or coerced.  Although silence is certainly not conclusive as to whether an exception exists, *see Negusie v. Holder*, 555 U.S. 511, 518 (2009); *cf. Holder v. Gutierrez*, 132 S. Ct. 2011, 2019 (2012) ("We cannot read a silent statute as requiring (not merely allowing) imputation just because that rule would be family-friendly."), the statutory framework makes clear that no exception was intended.  First, in the material support bar Congress explicitly carved out an exception, in the case of Tier III terrorist organizations, for aliens who "demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the

---

**[5]** In *Khan*, we acknowledged that there may be an exception to the definition of "terrorist activity" where "the law of the country in question incorporates international law such that the conduct in question is no longer 'unlawful' under the country's domestic law."  584 F.3d at 781. Annachamy argues that this case should be remanded to the BIA to consider whether Sri Lanka has incorporated international law, such that the LTTE's activities were not unlawful under Sri Lankan domestic law. Because Annachamy has not provided any evidence that Sri Lanka has incorporated such international law, we decline his invitation to remand.

organization was a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). That Congress included this express exception within the provision is some indication that it would have likewise expressly excepted involuntary support if it intended to do so.**[6]**

---

**[6]** In support of Annachamy's petition for rehearing, amici Harvard Immigrant Rights Clinic and the American Civil Liberties Union argue that the word "unlawful" from the statute's definition of "terrorist activity" creates an implicit duress exception because "unlawful" means "criminally culpable" and duress is a defense to criminal liability. We disagree. First, "unlawful" (which is not defined in the statute) merely means contrary to law, not necessarily contrary to *criminal* law. Many areas of law, including immigration, use the word unlawful without denoting criminal liability. *Compare* 8 U.S.C. § 1182(a)(9)(B)(ii) (deeming aliens to be *unlawfully* present if they remain in the United States after the expiration of their authorized period) *with Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012) (noting that "it is not a crime for a removable alien to remain present in the United States"); *see also* 29 U.S.C. § 623 (making it "unlawful," but not criminal, to discriminate on the basis of age); 5 U.S.C. § 706(2) (providing that agency action that is arbitrary or capricious is "unlawful").

Second, even assuming "unlawful" means "criminally culpable," the word appears in the definition of "terrorist activity," but the material support bar appears in the definition of "*engage in* terrorist activity," and this subsection does not include the word unlawful. *See* 8 U.S.C. § 1182(a)(3)(B)(i), (iii). "Terrorist activity" defines acts of terrorism, such as hijacking, assassination, etc., but "engage in terrorist activity" describes actions an individual might take, directly or indirectly, to aid in terrorism. Reading the entire statutory scheme together reveals that although the generic act of terrorism must be an unlawful act, the alien's commission of or support for that act of terrorism or terrorist organization need not be criminally liable for the material support bar to apply.

Finally, even if criminal culpability were required for the material support bar to apply, duress does not excuse the majority of acts listed in the definition of "terrorist activity." Duress does not excuse murder or even reduce murder to manslaughter. *See United States v. LaFleur*,

Second, as the BIA observed, Congress created an explicit involuntariness exception in a neighboring subsection. Section 1182(a)(3)(D)(i) provides that "[a]ny immigrant who is or has been a member of or affiliated with the Communist or any other totalitarian party (or subdivision or affiliate thereof), domestic or foreign, is inadmissible." Congress specified that the bar is inapplicable "if the alien establishes . . . that the membership or affiliation is or was involuntary." *Id.* § 1182(a)(3)(D)(ii). "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987) (alteration in original) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)); *see also Fedorenko v. United States*, 449 U.S. 490, 512 (1981) (holding, where Congress had included a voluntariness requirement in one subsection of the statute, but not another, that "the deliberate omission of the word 'voluntary' . . .

---

971 F.2d 200, 206 (9th Cir. 1991). And in many jurisdictions, duress does not excuse attempted murder or aiding and abetting murder either. *See, e.g.*, *People v. Vieira*, 106 P.3d 990, 1005–07 (Cal. 2005); *State v. Mannering*, 48 P.3d 367, 371 (Wash. Ct. App. 2002). All of the acts listed in the definition of "terrorist activity" involve either murder or a situation where an innocent person's life is placed in grave danger, *see* 8 U.S.C. § 1182(a)(3)(B)(iii), so even if the alien's support for the terrorist act had to be criminally culpable, duress would not necessarily negate that culpability. In short, the single, undefined use of the word "unlawful" in a different subsection cannot withstand the weight amici place on it: the importation of the entire doctrine of criminal law, including the opportunity to present all affirmative defenses.

compels the conclusion" that Congress did not intend to adopt a voluntariness requirement in the latter subsection).[7]

Third, the existence of an administrative waiver provision in the INA "weakens [Annachamy's] argument that the BIA's reading of the statutory language is overly broad, because the broad statutory definition is combined with a discretionary waiver by executive branch officials." *Khan*, 584 F.3d at 782. The waiver provision states:

> The Secretary of State, after consultation with the Attorney General and the Secretary of Homeland Security, or the Secretary of Homeland Security, after consultation with the Secretary of State and the Attorney General, may determine in such Secretary's sole unreviewable discretion that subsection (a)(3)(B) of this section [defining "terrorist activities"] shall not apply with respect to an alien within the scope of that subsection or that subsection (a)(3)(B)(vi)(III) of this section [defining Tier III terrorist organization] shall not apply to a group within the scope of that subsection, except that no such waiver may be extended to an alien who

---

[7] Annachamy points out that the totalitarian bar was enacted several years before the material support bar, as the BIA acknowledged, but we must "assume that Congress is aware of existing law when it passes legislation." *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). Presuming congressional awareness of existing legislation is particularly appropriate here because Congress updated the totalitarian party membership provision in the same legislation in which it created the material support bar. *See* H.R. Conf. Rep. No. 101-955, 1990 WL 201613, at § 601.

is within the scope of subsection (a)(3)(B)(i)(II) [i.e. an alien who the executive knows, or has reasonable ground to believe, is engaged in or likely to engage in terrorist activity after entry], no such waiver may be extended to an alien who is a member or representative of, has voluntarily and knowingly engaged in or endorsed or espoused or persuaded others to endorse or espouse or support terrorist activity on behalf of, or has voluntarily and knowingly received military-type training from a terrorist organization that is [designated as a Tier I or II terrorist organization], and no such waiver may be extended to a group that has engaged terrorist activity against the United States or another democratic country or that has purposefully engaged in a pattern or practice of terrorist activity that is directed at civilians.

8 U.S.C. § 1182(d)(3)(B)(i).[8] As we recognized in *Khan*, this delegation of authority to the specified Secretaries reflects

---

[8] The waiver provision was originally passed as part of the Real ID Act of 2005. *See* Pub. L. No. 109-13, § 104, 119 Stat. 231, 309 (2005). It was amended to its current form by the Consolidated Appropriations Act, 2008. *See* Pub. L. No. 110-161, § 691(a), 121 Stat 1844 (2007). Although the waiver provision was not enacted until 15 years after the creation of the material support bar, the waiver provision is still relevant in determining the earlier congressional intent. *See Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380–81 (1969) ("Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction."); *see also Barahona v. Holder*, 691 F.3d 349, 355 (4th Cir. 2012) (considering the waiver provision in its analysis of the material support bar).

Congress' determination that executive branch officials are in a position to judge the characteristics of particular groups engaging in terrorist activities, *see* 584 F.3d at 782, perhaps taking into account whether the groups have a practice of forcing innocent civilians to support their causes under threat of force.

Indeed, the relevant officials here have exercised their authority to create a mechanism by which aliens who have provided material support under duress may be exempted from the material support bar. In March 2007, Secretary of Homeland Security Michael Chertoff, after appropriate consultations, exercised his discretion under the waiver provision to exempt from the material support bar aliens who provided support to several specific organizations. *See* Exercise of Authority Under Sec. 212(d)(3)(B)(i) of the Immigration and Nationality Act, 72 Fed. Reg. 9954-01 to 9957-02 (Mar. 6, 2007) (exempting aliens who provide material support to the Alzados, Kayan New Land Party, Karenni National Progressive Party, Karen National Union/Karen National Liberation Army, Mustangs, Arakan Liberation Party, Chin National Front/Chin National Army and Chin National League for Democracy). He also exercised his discretion by creating a mechanism by which certain aliens who provided material support to a Tier III terrorist organization under duress could be exempted from the material support bar. *See* Exercise of Authority Under Sec. 212(d)(3)(B)(i) of the Immigration and Nationality Act, 72 Fed. Reg. 9958-01 (Mar. 6, 2007). He set forth specific criteria an alien must meet to qualify for a duress exception and delegated to U.S. Citizenship and Immigration Services, in consultation with U.S. Immigration and Customs Enforcement, the authority to make individual determinations. *See id.* Shortly thereafter, the Secretary

extended the mechanism for duress waivers to aliens who provided support to Tier I and Tier II organizations. *See* Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and Nationality Act, 72 Fed. Reg. 26138-02 (May 8, 2007).**[9]**

Subsequent legislative action helps clarify Congress' intent. Only months after Secretary Chertoff issued his directive exempting specified groups from the material support bar and creating a mechanism for processing duress waivers, Congress passed the Consolidated Appropriations Act, 2008. *See* Pub. L. No. 110-161, 121 Stat 1844 (Dec. 26, 2007). That Act created a statutory exemption from the material support bar for the eight groups the Secretary had previously excepted from the bar. *See id.* In response to the mechanism for duress waivers, the Act also required the Secretary to report to Congress on an annual basis:

---

**[9]** We acknowledge that several commentators have questioned the adequacy of the Secretary's waiver mechanism. *See, e.g.*, Steven H. Schulman, *Victimized Twice: Asylum Seekers and the Material-Support Bar*, 59 Cath. U. L. Rev. 949, 953-54 (2010) (describing "pronounced" delays associated with the waiver process); Human Rights First, Denial and Delay: The Impact of the Immigration Law's "Terrorism Bars" on Asylum Seekers and Refugees in the United States, 7–8 (2009), *available at* http://www.humanrightsfirst.org/wp-content/uploads/pdf/ RPP-DenialandDelay-FULL-111009-web.pdf (last visited May 28, 2012). We express no opinion as to the efficacy of the waiver mechanism. That determination has been delegated solely to the Secretaries of State and of Homeland Security and, as we discuss below, Congress appears to be monitoring the mechanism in an effort to strike the appropriate balance between the United States' humanitarian obligations and national security. We rely on the waiver provision only insofar as it informs our understanding of the statutory structure.

(1) the number of individuals subject to removal from the United States for having provided material support to a terrorist group who allege that such support was provided under duress;

(2) a breakdown of the types of terrorist organizations to which the individuals described in paragraph (1) have provided material support;

(3) a description of the factors that the Department of Homeland Security considers when evaluating duress waivers; and

(4) any other information that the Secretary believes that the Congress should consider while overseeing the Department's application of duress waivers.

*Id.* These legislative reactions indicate that Congress was deliberate in delegating to the Secretary the sole authority to waive the applicability of terrorist-related bars, and has paid specific attention to duress waivers.

Moreover, the Act amended the waiver provision itself, significantly expanding the Secretaries' authority to grant waivers.[10]  Among the amendments was an express

---

[10] Prior to the Act, the Secretary was given authority to issue waivers with respect to only three specific terrorism bars. *See* 8 U.S.C. § 1182(d)(3)(B)(i) (2006) (permitting waivers for aliens who were members of a political group that endorsed terrorist activity, themselves endorsed terrorist activities or provided material support to a terrorist

prohibition on waivers to aliens who "voluntarily and knowingly" support or receive training from Tier I and II organizations, again indicating that Congress has appreciated the distinction between voluntary and involuntary conduct when amending the INA and has been express when it seeks to distinguish between the two. In light of all this legislative activity, we should defer to Congress' chosen method to try to strike the correct balance between the United States' humanitarian obligations and national security.[11]

---

activity). The Act amended the waiver provision to permit the Secretary to waive almost all of the terrorism-related bars. *See id.* § 1182(d)(3)(B)(i) (2008) (permitting waiver for any part of subsection (a)(3)(B), except where executive official has reasonable grounds to believe the alien is engaged in or is likely to engage after entry in terrorist activity or the alien has voluntary and knowingly espoused support for, received military training from or engaged in terrorist activity on behalf of a Tier I or II terrorist organization). This amendment made eligible for waivers several classes of aliens who were previously ineligible, including members and representatives of Tier III organizations, persons who themselves have "engaged in terrorist activity," provided that it was not on behalf of a Tier I or II organization, and persons who "engaged in terrorist activity" on behalf of a Tier I or II group, provided that they did not do so voluntarily and knowingly.

[11] At oral argument, Annachamy urged us not to rely on the executive waiver provision when interpreting the material support bar in this instance because the Secretary lacks the authority to grant him a waiver. Specifically, he points to an exception to the waiver provision that says "no . . . waiver may be extended to a group that has engaged terrorist activity against the United States or another democratic country," 8 U.S.C. § 1182(d)(3)(B)(i), and Sri Lanka is a democratic country. Annachamy misreads the statute. By its own terms, the exception limits only the Secretaries' authority to extend waivers to groups. *See id.* (delegating the authority to "determine . . . that subsection (a)(3)(B)(vi)(III) of this section [defining Tier III terrorist organizations] shall not apply to *a group* within the scope of that subsection" (emphasis added)). The exception does not apply to the Secretaries' authority to

Annachamy argues that interpreting the material support bar to include aliens who provided support under duress is inconsistent with *Fedorenko v. United States*, 449 U.S. 490 (1981), and *Negusie v. Holder*, 555 U.S. 511 (2009). We disagree. In *Fedorenko*, the Court interpreted the Displaced Persons Act of 1948 (DPA), which Congress enacted "to enable European refugees driven from their homelands by [World War II] to emigrate to the United States without regard to traditional immigration quotas." 449 U.S. at 495. "The DPA incorporated the definition of 'refugees or displaced persons' contained in Annex I to the Constitution of the International Refugee Organization of the United Nations" (IRO Constitution). *Id.* at 495 n.3. Section 2 of the IRO Constitution, as codified by Congress, excluded any individual "who can be shown: (*a*) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or (*b*) to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations." *Id.* at 495 n.4 (quoting Annex I, Part II, 62 Stat. 3037, 3051–52 (1946)) (internal quotation marks omitted). The *Fedorenko* Court held that "an individual's service as a concentration camp armed guard — whether voluntary or involuntary — made him ineligible for a visa" under § 2(a) of the IRO Constitution. *Id.* at 512. The Court observed, "[t]hat Congress was perfectly capable of adopting a 'voluntariness' limitation where it felt that one was necessary is plain from comparing § 2(a) with § 2(b), which excludes only those individuals who '*voluntarily* assisted the enemy forces . . . in their operations.'" *Id.* (alteration in original) (emphasis in

---

"determine . . . that subsection (a)(3)(B) of this section [which includes the material support bar] shall not apply with respect to *an alien* within the scope of that subsection." *Id.* (emphasis added).

original).    "Under traditional principles of statutory construction, the deliberate omission of the word 'voluntary' from § 2(a) compels the conclusion that the statute made *all* those who assisted in the persecution of civilians ineligible for visas." *Id.* (emphasis in original).

In *Negusie*, the BIA held that it was constrained by *Fedorenko* to read an implied involuntariness exception into the INA's persecutor bar.  *See* 555 U.S. at 518.[12]   The Supreme Court held that the BIA erred by assuming that *Fedorenko* controlled without considering the differences between the statutory frameworks at issue in *Fedorenko* and *Negusie*.  In particular, "[t]he textual structure of the statute in *Fedorenko* ('voluntary' is in one subsection but not the other) [was] not part of the statutory framework considered" in *Negusie*. *Id.* at 519.  The Court remanded to allow the BIA to exercise its interpretive authority to construe the persecutor bar.  *See id.* at 522–23.

*Fedorenko* and *Negusie* are consistent with our conclusion here.  As with the IRO Constitution in *Fedorenko*, Congress' express distinction between voluntary and involuntary conduct in § 1182 compels the conclusion that it deliberately omitted a voluntariness requirement from the material support bar.  Furthermore, we are not faced with a situation in which the BIA mistakenly based its decision on precedent that was not controlling.  Rather, the BIA engaged in an independent interpretation of the statute, employing

---

[12] The persecutor bar states:  "The term 'refugee' does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42).

some of the same canons of statutory interpretation that we have applied above, and concluded that the material support bar contains no exception for duress.**[13]**

We also reject Annachamy's suggestion that construing the material support bar to include involuntary support conflicts with the United States' obligations under the United Nations Protocol Relating to the Status of Refugees ("Protocol") and the United Nations Convention Relating to the Status of Refugees ("Convention"). Although Annachamy does not identify the provisions of the Convention or Protocol that support his argument, he apparently relies on the Convention's limited exceptions to refugee status and its nonrefoulement provision. The Convention excepts from the definition of refugee:

---

[13] Annachamy also argues that the criminal law presumption of a duress exception should be imported into immigration law. In *Negusie*, the Supreme Court did not decide whether the INA's persecutor bar imports this principle of criminal culpability. *See* 555 U.S. at 517–18 (declining to address the issue). Some Justices were divided on the issue. *Compare id.* at 526 (Scalia, J., joined by Alito, J., concurring) (providing several reasons a duress defense based on principles of criminal culpability should not necessarily be read into the INA's persecutor bar) *and id.* at 549 n.3 (Thomas, J., dissenting) (arguing that "[t]here is no warrant to read criminal-law requirements into" the INA) *with id.* at 536–37 (Stevens, J., joined by Breyer, J., concurring in part and dissenting in part) (arguing that principles of criminal culpability should apply to the persecutor bar). Unlike *Negusie*, however, where the statutory structure surrounding the persecutor bar did not inform the provision's silence as to duress, the statutory structure surrounding the material support bar would be strong enough to defeat the criminal law presumption that there is a duress exception. Thus, we need not reach the more general question of whether Congress should be presumed to have legislated with a duress exception in mind.

any person with respect to whom there are serious reasons for considering that:

(*a*) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;

(*b*) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;

(*c*) he has been guilty of acts contrary to the purposes and principles of the United Nations.

Convention, art. 1F, *reprinted in* 19 U.S.T. 6223.

The Convention also includes a duty of nonrefoulement, which provides that "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." *Id.* at art. 33.1. The Convention also states, however, that the benefit of nonrefoulement may not "be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is." *Id.* at art. 33.2.

In *Khan*, we rejected the argument that Article 1F and the duty of nonrefoulement compelled a narrow reading of the INA's terrorist bars that would exclude legitimate armed resistance. Although the United States acceded to the Protocol in 1968, the Protocol is not self-executing and

therefore does not have the force of law in American courts. *See Khan*, 584 F.3d at 783. We nonetheless "follow[ed] the general rule of the *Charming Betsy* canon that 'an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains.'" *Id.* (quoting *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)). We observed that "[t]he Protocol, through Refugee Convention Article 33.2, allows the United States to refoul an individual 'whom there are reasonable grounds for regarding as a danger to the security' of the United States" and that, according to the United Nations High Commissioner for Refugees, "'the determination of refugee status . . . is incumbent upon the Contracting state in whose territory the refugee finds himself.'" *Id.* at 783–84 (second alteration in original). Thus, Congress' determination in the INA that "an alien who [has engaged in a terrorist activity] shall be considered to be an alien with respect to whom there are reasonable grounds for regarding as a danger to the security of the United States," 8 U.S.C. § 1231(b)(3), adhered to the Protocol's nonrefoulement provision and controlled our decision. *See id.* at 784. The same reasoning applies here. Under the Protocol and Convention, Congress is free to decide that an alien who provided material support to a terrorist organization, even if under duress, is a danger to the security of the United States.[14,15]

---

[14] Although neither party cites them, we note that the U.N. Guidelines on the application of Article 1F specify that "[f]actors generally considered to constitute defences to criminal responsibility," including duress, "should be considered." UNHCR, Guidelines on International Protection: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees § II.E.22 (2003) ("Guidelines"). We presume that these Guidelines, like the U.N. Handbook, "may be a useful interpretive aid," but they are "not binding on the Attorney General, the BIA, or United States courts." *INS v.*

## IV.

For the foregoing reasons, we hold that the material support bar does not include an implied exception for individuals who assist organizations engaged in legitimate political violence or who provide support under duress.

**PETITION DENIED.**

---

*Aguirre-Aguirre*, 526 U.S. 415, 427 (1999). In any event, the Guidelines do not conflict with our interpretation. An individual ineligible for asylum due to the material support bar is excluded because he is a "danger to the security of the United States," as permitted by Article 33.2 of the Convention. *Khan*, 584 F.3d at 784 (quoting 8 U.S.C. § 1231(b)(3)). The Guidelines do not apply to Article 33.2. *See* Guidelines § I.B.4 ("[T]he exclusion clauses are not to be confused with Articles 32 and 33(2) of the Convention which deal respectively with the expulsion of, and the withdrawal of protection from refoulement from, recognised refugees who pose a danger to the host State (for example, because of serious crimes they have committed there). Article 33(2) concerns the future risk that a recognised refugee may pose to the host State.").

[15] Furthermore, as we noted in *Khan*, even if there were a conflict, the administrative waiver provision, by granting the executive the discretion to waive applicability of the terrorist bars as to aliens who are not a danger to the United States, is probably sufficient to resolve the conflict. *See Khan*, 584 F.3d at 784 (citing *INS v. Stevic*, 467 U.S. 407, 428 n.22 (1984)).