**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-2996
_____

MUSA SESAY,
                              Petitioner

v.

ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA,
                              Respondent
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(BIA No. A094-244-759)
Immigration Judge: Honorable Annie S. Garcy
_____

Argued on January 22, 2015

Before:  RENDELL, SMITH, and KRAUSE, *Circuit Judges*

(Filed: May 26, 2015)
_____

Thomas V. Massucci, Esq. (Argued)
Suite 908
401 Broadway
New York, NY 10013
	*Counsel for Petitioner*

Loretta Lynch, Esq.
Thomas W. Hussey, Esq.
Jeffrey L. Menkin, Esq.     (Argued)
Benjamin Zeitlin, Esq.
United States Department of Justice
Office of Immigration Litigation, Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
	*Counsel for Respondent*

_____

OPINION

_____


KRAUSE, *Circuit Judge*:

In the midst of Sierra Leone's catastrophic civil war, Musa Sesay was forced to provide assistance to a terrorist group while facing regular beatings and the barrel of a gun. He resisted when possible and escaped when he could. In short, he was himself a victim of terrorist violence, and, to the extent he provided any aid to the group, he did so under duress. However, because the Board of Immigration Appeals ("BIA") concluded that there was no duress exception to the bar on asylum or withholding of removal for aliens who

provide material support to terrorist groups, it found him ineligible for relief.

Sesay now petitions for review of the BIA's order denying his application for asylum and ordering him removed from the United States, and we must decide for the first time whether there is a duress exception to the material support bar. While we are sympathetic to Sesay's plight, long-standing canons of statutory construction and the opinions of our sister Circuits on this issue convince us that there is no such exception. Thus, we will deny the petition for review.

## I.    Facts[1]

The facts relevant here date back to early 2001, the eleventh year of what is widely recognized as a brutal civil war in Sierra Leone.[2] Amid the humanitarian catastrophe,

---

[1] We take our facts from the final order of the BIA, and to the extent the BIA relied upon it, the Immigration Judge's decision. *See Gonzalez-Posadas v. Att'y Gen.*, 781 F.3d 677, 684 n.5 (3d Cir. 2015).

[2] As described by a contemporaneous State Department report, the war was replete with a ghastly array of atrocities against civilians, including the amputation of ears, noses, hands, arms, and legs of noncombatants; the use of rape as a terror tactic; the abduction and forced conscription of children into service as soldiers and sexual slaves; the massacre of fleeing civilians; and the coercion of citizens under penalty of mutilation or death to commit atrocities themselves. *See* U.S. Dep't of State, 1999 Country Reports on Human Rights Practices: Sierra Leone (2000), *available at* http://www.state.gov/j/drl/rls/hrrpt/1999/270.htm, A.R. 228-

3

and at a time when a fragile peace accord had largely failed, Sesay lived with his family in the country's capital, Freetown. One night in early 2001, three rebels from the Revolutionary United Front ("RUF") forcibly entered Sesay's home and demanded he join the RUF. When he refused, and while his parents pleaded for his safety, the rebels blindfolded him and took him away. Upon arriving at a windowless room, the rebels again demanded he join the RUF, again beat him when he said no, and imprisoned him. Over approximately the next month, the rebels periodically asked whether he was ready to join the RUF. Each time, he refused. And each time, they beat him in response.

After about one month of imprisonment, the rebels moved Sesay to a RUF encampment where he witnessed some captives being executed and saw others with missing body parts. While there, the rebels tried to train him to use a machine gun. Again, he refused. Because Sesay was untrained in weaponry, the rebels forced him instead to provide menial assistance. Specifically, on approximately five occasions, he entered the Sierra Leone jungle with the rebels during active fighting. RUF trucks, however, had trouble traversing the jungle terrain. As a result, the rebels forced Sesay and others to carry their weapons, ammunition, drinking water, and food, and to load and unload these

---

29, 233, 240. By the time the eleven-year-long war ended in 2002, as many as two million citizens were displaced. *See* Mohammed Fofana, *Sierra Leone: Political Rivalry Spills over into Street Violence*, Inter Press Service, August 18, 2008, A.R. 318.

4

provisions from the trucks. Sesay complied under supervision of an armed guard.

After about one month in the encampment, Sesay used the chaos of war to his advantage. When Guinean aircraft approached the encampment, frightening the rebels, Sesay escaped, fleeing to neighboring Guinea, and eventually, Gambia. In May 2001, he entered the United States and soon thereafter applied for asylum. Except for a permitted trip to visit his ill mother, he has been in the United States ever since. In December 2009, he was served with a Notice to Appear, and proceedings before an Immigration Judge ("IJ") followed.

## II.     Legal Standards and Procedural History

Under the Immigration and Nationality Act ("INA"), an alien seeking asylum must demonstrate either (i) proof of past persecution, or (ii) a well-founded fear of future persecution in his home country "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42); *see Camara v. Att'y Gen.*, 580 F.3d 196, 201-02 (3d Cir. 2009). "Although these two roads to asylum are doctrinally distinct from one another, they intersect." *Camara*, 580 F.3d at 202. Specifically, a well-founded fear of future persecution, without more, entitles an applicant to asylum. *Id.* But a "demonstration of past persecution can be rebutted by the government if the government 'establishes by a preponderance of the evidence that the applicant could reasonably avoid persecution by relocating to another part of his or her country or that conditions in the applicant's country have changed so as to make his or her fear no longer

5

reasonable.'" *Id.* (quoting *Abdulrahman v. Ashcroft*, 330 F.3d 587, 592 n.3 (3d Cir. 2003)).

An application for withholding of removal is reviewed under a more stringent standard. In that case, an alien "must establish a clear probability, that is, that it is more likely than not that [his] life or freedom would be threatened if returned to [his] country" because of his protected class. *Kaita v. Att'y Gen.*, 522 F.3d 288, 296 (3d Cir. 2008) (internal quotation marks omitted).

Regardless of whether an alien demonstrates he is eligible for relief, he will be deemed inadmissible and ineligible for asylum or withholding of removal if he has engaged in terrorist activities, including the provision of material support for terrorist groups. 8 U.S.C. §§ 1158(b)(2)(A)(v), 1182(a)(3)(B)(i)(I), 1231(b)(3)(B), 1227(a)(4)(B).

## A. Decision of the Immigration Judge

After conducting a hearing and considering evidence, the IJ found Sesay credible and concluded that he was a victim of past persecution on account of his membership in a particular social group, i.e., those who vocally opposed forced conscription into the RUF. As a result, he was entitled to a rebuttable presumption of future persecution. *See Camara*, 580 F.3d at 202. The IJ found, however, that the Government rebutted this presumption by demonstrating that in the years since Sesay fled, the RUF disbanded, and reconciliation in Sierra Leone generally has been successful. Accordingly, with the presumption of future persecution rebutted, the IJ found Sesay ineligible for asylum or withholding of removal.

In the alternative, the IJ also found Sesay ineligible for asylum and withholding of removal because he provided material support to the RUF, the same group that beat him, imprisoned him, and forced him to provide menial labor under threat of death. To reach this determination, the IJ found that the RUF was an unclassified, or Tier III, terrorist organization.[3] Then, citing our holdings in *McAllister v. Attorney General*, 444 F.3d 178 (3d Cir. 2006), and *Singh-Kaur v. Ashcroft*, 385 F.3d 293 (3d Cir. 2004), the IJ found that Sesay's carrying of weapons, ammunition, food, and water for the RUF constituted material support. Finally, the IJ conducted a statutory analysis of the INA and concluded that it does not contain a duress exception to the material support bar. The fact that Sesay's actions were involuntary, the IJ found, was irrelevant.

## B. Proceedings before the BIA

In a single-member, non-precedential opinion, the BIA affirmed the IJ's decision and dismissed Sesay's appeal. The

---

[3] A Tier III terrorist organization is defined as a "group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, [terrorist activities.]" 8 U.S.C. § 1182(a)(3)(B)(vi)(III). The parties agree that the RUF was a Tier III terrorist organization during the relevant time period and that Sesay understood this for purposes of the Act. After Sesay left Sierra Leone, the RUF was designated as a Tier II terrorist organization. *See* Designation of 39 "Terrorist Organizations" Under the "PATRIOT USA Act," 66 Fed. Reg. 63620-01 (Dec. 7, 2001). The distinction between these two categories is not material to our disposition here.

BIA did not consider whether Sesay had a well-founded fear of future persecution. Instead, it agreed with the IJ that Sesay's actions constituted material support for terrorism and that there was no duress exception.

Sesay now petitions for review of the BIA decision. The parties agree that two issues are presented: whether the record supports that Sesay provided material support for terrorism, and if so, whether there is a duress exception to the material support bar.

## III. Jurisdiction and Standard of Review

We have jurisdiction to review final orders of the BIA pursuant to 8 U.S.C. § 1252. Where, as here, the BIA "relie[d] on an IJ's legal conclusions and findings of fact, we review the IJ's decision and the Board's decision." *Gonzalez-Posadas*, 781 F.3d at 684 n.5. In doing so, we "accept factual findings if supported by substantial evidence," a deferential standard under which we "uphold the agency's determination unless the evidence would compel any reasonable fact finder to reach a contrary result." *Id.*[4]

---

[4] The BIA adopted, or at minimum, expressed no disagreement, with the IJ's determination that Sesay was credible. "As a practical matter, therefore, we must proceed as if [Sesay's] testimony were credible and determine whether the BIA's decision is supported by substantial evidence in the face of his assumed (but not determined) credibility." *Kayembe v. Ashcroft*, 334 F.3d 231, 235 (3d Cir. 2003). Regardless, Sesay's unchallenged credibility is not significant to the disposition of our case. *See id.*

We review the BIA's legal determinations de novo, ordinarily subject to the principles of deference set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-45 (1984). *Kaplun v. Att'y Gen.*, 602 F.3d 260, 265 (3d Cir. 2010). We do not, however, give *Chevron* deference to unpublished, single-member BIA decisions such as the one here. *Mahn v. Att'y Gen.*, 767 F.3d 170, 173 (3d Cir. 2014). At most, we treat those decisions as persuasive authority. *Id.* (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

## IV.    Discussion

### A.  The Material Support Bar

The INA prevents an alien from receiving a grant of asylum or withholding of removal if that alien has engaged in, is engaged in, or is likely to engage in terrorism. "The INA defines [these terms] broadly." *Haile v. Holder*, 658 F.3d 1122, 1126 (9th Cir. 2011). Engaging in terrorist activities, for example, includes "commit[ting] an act that the actor knows, or reasonably should know, affords material support . . . . to a terrorist organization . . . or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI).

We first considered the meaning of material support in *Singh-Kaur*. 385 F.3d at 298-301. There, the asylum applicant, Singh-Kaur, was a member of a Sikh separatist group in India that was "fighting the Indian government," for which he provided food and set up tents at the group's religious meetings. *Id.* at 296, 299-301. We concluded that

9

Singh-Kaur's actions, even if non-violent and tangential to any specific terrorist acts, were sufficient to count as material support and thus to render him ineligible for a grant of asylum. *Id.* at 300-01. It was enough, we held, that he provided general support to a group that had terrorist aims. *Id.* at 301.[5]

Since *Singh-Kaur*, the BIA and Courts of Appeals have repeatedly upheld findings that an alien's support was material, even if it was relatively low-level. *See Bojnoordi v. Holder*, 757 F.3d 1075, 1078 (9th Cir. 2014) (upholding finding of material support because the alien "passed out flyers, wrote articles, and trained [a terrorist group's]

_____

[5] The Supreme Court has taken a similarly expansive view of what constitutes material support in the context of the criminal statute banning material support, stating that "[m]aterial support meant to promote peaceable, lawful conduct can further terrorism by foreign groups in multiple ways." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010) (internal quotation marks, alteration, and citation omitted); *id.* at 36 ("At bottom, plaintiffs simply disagree with the considered judgment of Congress and the Executive that providing material support to a designated foreign terrorist organization—even seemingly benign support— bolsters the terrorist activities of that organization. That judgment, however, is entitled to significant weight, and we have persuasive evidence before us to sustain it."); *see also McAllister*, 444 F.3d at 187 (observing that "the INA's definition of 'terrorist activity' certainly encompasses more conduct than our society, and perhaps even Congress, has come to associate with traditional acts of terrorism, *e.g.*, car bombs and assassinations").

members on the use of guns in the mountains outside Tehran, knowing that this training would further [the terrorist group's] goals"); *Viegas v. Holder*, 699 F.3d 798, 803 (4th Cir. 2012) (upholding finding of material support because the alien "paid dues and hung posters" for a terrorist group); *Barahona v. Holder*, 691 F.3d 349, 351-52, 356 (4th Cir. 2012) (upholding finding of material support because the alien, under threat, allowed terrorists to use his kitchen, gave them directions through the jungle, and occasionally allowed them to stay overnight); *Haile*, 658 F.3d at 1129 (upholding finding of material support because the alien collected funds, passed along secret documents and supplied the terrorist organization with sugar, shoes, and cigarettes); *Hussain v. Mukasey*, 518 F.3d 534, 538 (7th Cir. 2008) (upholding finding of material support because the alien recruited and solicited funds for a terrorist group); *In Re S-K-*, 23 I. & N. Dec. 936, 945-46 (BIA 2006) (upholding finding of material support because the alien contributed a total of 1,100 Singapore dollars to a terrorist group).

In the face of this case law, Sesay struggles to explain why his actions do not qualify as material support. His argument seems to be that the support he provided was so small in size that it was not "material," pursuant to the plain meaning of that word. *See, e.g.*, Black's Law Dictionary 1124 (10th ed. 2014) (defining material as "[h]aving some logical connection with the consequential facts" and "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential").

The BIA and Courts of Appeals have not squarely addressed whether a de minimis exception exists in the statute, although the BIA has held in a well-reasoned, not precedential opinion that assistance must be more than de

11

minimis in order to give "material" some independent effect. *See In Re: * * *, 2009 WL 9133770, at *2 (BIA July 10, 2009) (observing that even if the items taken from the alien, including "one packed lunch and the equivalent of about $4 U.S. dollars, which the terrorists expressly stated would be used to buy beer," constituted "'support' for the terrorists, it cannot be said to be material"). We too, have held that "material" must be ascribed some meaning. *See Singh-Kaur*, 385 F.3d at 298 (examining Black's Law Dictionary definition of the word).

We need not define the outer boundaries of materiality today, however, because we conclude that Sesay's actions exceeded a de minimis threshold. That is, if providing food and setting up tents at religious meetings constituted material support in *Singh-Kaur*, 385 F.3d at 298-301, then so too does carrying weapons and ammunition for a terrorist group during a brutally violent conflict. Accordingly, the IJ and the BIA were correct to find that Sesay provided material support to a terrorist organization.

## B. A Duress Exception to the Material Support Bar

Sesay did not *voluntarily* provide material support to a terrorist group. To the contrary, he did so while being regularly assaulted and under the threat of death or severe bodily harm. Thus, we must grapple with an issue that our Circuit has yet to address: whether involuntary material support, even when provided under threat of death, bars an alien from receiving asylum or withholding of removal. We conclude that it does.

We begin with the plain text of the statute, which does not provide for a duress exception to the material support bar. *See* 8 U.S.C. § 1182(a)(3)(B)(iv)(VI) (stating that an alien is inadmissible if he "commit[s] an act that [he] knows, or reasonably should know, affords material support" to a terrorist organization). In isolation, statutory silence may not be conclusive. *See Negusie v. Holder*, 555 U.S. 511, 518 (2009). The silence here, however, speaks volumes, given the express exception to the material support bar for aliens who "demonstrate by clear and convincing evidence that [they] did not know, and should not reasonably have known, that the organization was a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). Thus, we agree with the observation of the Ninth Circuit in addressing this issue: "That Congress included this express [knowledge] exception within the provision is some indication that it would have likewise expressly excepted involuntary support if it intended to do so." *Annachamy v. Holder*, 733 F.3d 254, 260 (9th Cir. 2013), *overruled on other grounds by Abdisalan v. Holder*, 774 F.3d 517 (9th Cir. 2014).

Moreover, a neighboring subsection of the statute contains an exception precisely for involuntariness. That subsection, the so-called "totalitarian bar," renders inadmissible any alien who "has been a member of or affiliated with the Communist or any other totalitarian party (or subdivision or affiliate thereof), domestic or foreign," but expressly excepts an alien who demonstrates "that the membership or affiliation is or was involuntary." 8 U.S.C § 1182(a)(3)(D)(i)-(ii); *see also Alturo v. Att'y Gen.*, 716 F.3d 1310, 1314 (11th Cir. 2013) (observing that the lack of duress exception "stands in marked contrast to a neighboring provision in the INA that includes an explicit involuntariness

13

exception for aliens who have been affiliated with a totalitarian party"); *Annachamy*, 733 F.3d at 261 (same). Thus, the omission of such an exception in § 1182(a)(3)(B)(iv)(VI) is telling, for "the Supreme Court [has] observed that '[w]here Congress includes particular language in one section of a statute but omits it from another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*, 783 F.3d 156, 165 (3d Cir. 2015) (quoting *Russello v. United State*s, 464 U.S. 16, 23 (1983)).[6]

Subsequent events also throw Congress's intent into sharp relief. In 2005, Congress amended the INA to grant the Secretaries of State and Homeland Security the "sole unreviewable discretion" to waive the material support bar's restrictions in limited circumstances. Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, Pub. L. No. 109-13, § 104, 119 Stat. 231, 309. Pursuant to this authority, the Secretary of Homeland Security announced that the material support bar could be waived for aliens who provided material support under duress, pursuant to a number of different factors. *See* Exercise of Authority Under Section

---

[6] And while the canon is arguably less applicable, given that the material support bar and the totalitarian bar were enacted by different Congresses, *see Singh-Kaur*, 385 F.3d at 299, it is telling that Congress "updated the totalitarian party membership provision in the same legislation in which it created the material support bar." *Annachamy*, 733 F.3d at 261 n.7 (9th Cir. 2013) (citing H.R. Conf. Rep. No. 101-955, 1990 WL 201613, at § 601).

14

212(d)(3)(B)(i) of the Immigration and Nationality Act, 72 Fed. Reg. 26138-02 (May 8, 2007) (announcing waiver scheme for Tier I and II terrorist groups); Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and Nationality Act, 72 Fed. Reg. 9958–01 (Mar. 6, 2007) (announcing waiver scheme for Tier III terrorist groups).

Congress reacted quickly to those regulations. First, it expanded the Secretaries' ability to grant waivers, "permit[ting] the Secretar[ies] to waive almost all of the terrorism-related bars," *Annachamy*, 733 F.3d at 263 n.10, but not extending that power to waivers for aliens who "voluntarily and knowingly" were members of Tier I or Tier II organizations or who "voluntarily and knowingly" provided support to those same organizations.[7] *See* Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, § 691(a), 121 Stat. 1844. Second, it created a mechanism for the Secretary of Homeland Security to report to Congress on the number of

---

[7] Sesay did not apply for a waiver early on for a reason that gives us considerable pause. As the Government acknowledged at argument, almost ten years after Congress granted the Executive Branch the power to grant waivers, there remains no published process for requesting one, although as represented by government counsel, numerous requests have been granted through ad hoc submissions to counsel for the Department of Homeland Security. *See also Ay*, 743 F.3d at 321 ("At oral argument in the case at bar . . . the Government was unable to identify any published process for seeking such a waiver."). After argument, Sesay's counsel did request a waiver through a letter to opposing counsel, but, as he subsequently informed the Court, the request was denied.

persons subject to removal for providing material support under duress.[8]  *See id.* at § 691(e).

Given that the 2007 Amendments discussed duress waivers and voluntariness, and required reporting on persons removed for having provided material support under duress, Congress clearly legislated on the premise that the material support bar otherwise applied to support given under duress. *See Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 176-77 (3d Cir. 2015) (observing that subsequent Congressional amendments to a statute provide insight on Congressional intent to the statute generally); *Annachamy*, 733 F.3d at 262 n.8 ("Although the waiver provision was not enacted until 15 years after the creation of the material support bar, the waiver provision is still relevant in determining the earlier congressional intent."). To read the statute in any other way would make Congress's reporting requirement meaningless and would contravene unambiguous legislative intent.

In sum, Congress has "delegat[ed] to the Secretary the sole authority to waive the applicability of terrorist-related bars, . . . has paid specific attention to duress waivers," and "has appreciated the distinction between voluntary and

---

[8] In recent years, the Secretaries of State and Homeland Security have continued to expand the categories of activities eligible for waiver. *See* Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and Nationality Act, 79 Fed. Reg. 6914-01 (Feb. 5, 2014) (creating waiver authority for aliens who provided "limited material support" under "substantial pressure that does not rise to the level of duress").

involuntary conduct." *Annachamy*, 733 F.3d at 263-64.[9] Thus, absent a waiver from the Executive Branch, the INA precludes asylum or withholding of removal for any alien who provided material support, voluntarily or involuntarily.

* * *

We recognize the harsh consequence of our holding, but it is compelled by policy decisions that reside with Congress and the Executive Branch. *See Humanitarian Law Project*, 561 U.S. at 33-34 (stating that the Judiciary must often defer to Congress when considering legislation dealing with the "sensitive and weighty interests of national security

---

[9] Our conclusion is squarely in line with the Fourth Circuit, *Barahona*, 691 F.3d at 353-56, the Ninth Circuit, *Annachamy*, 733 F.3d at 260-66, and the Eleventh Circuit, *Alturo*, 716 F.3d at 1314. The only court to have veered somewhat from this path is the Second Circuit, which did not reach a conclusion on the issue and instead remanded to the BIA to issue a precedential decision on the matter. *Ay v. Holder*, 743 F.3d 317, 320-21 (2d Cir. 2014). In a series of not precedential opinions following *Ay*, the Second Circuit has continued to remand for the same reason. *See Gurung v. Holder*, 591 F. App'x 16, 18 (2d Cir. 2014); *Hernandez v. Holder*, 579 F. App'x 12, 15 (2d Cir. 2014); *Ayvaz v. Holder*, 564 F. App'x 625, 628 (2d Cir. 2014). We decline to take the Second Circuit's approach, for while we accord *Chevron* deference to the BIA's interpretations of ambiguity in the INA, *Abdulai v. Ashcroft*, 239 F.3d 542, 551 (3d Cir. 2001), we have no need to await a precedential decision from the BIA when the issue is one of unambiguous statutory interpretation.

and foreign affairs").  Accordingly, we join with our sister Courts of Appeals and conclude that the material support bar does not distinguish between voluntary and involuntary support.  The BIA correctly held that Sesay is ineligible for asylum or withholding of removal for having provided material support to a terrorist group, and his petition for review therefore will be denied.