16-2323-ag
*Hernandez v. Sessions*

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2017
No. 16-2323-ag


MARLENY HERNANDEZ,
*Petitioner*,


*v.*


JEFFERSON B. SESSIONS III, United States Attorney General,
*Respondent*.


ARGUED: NOVEMBER 30, 2017
DECIDED: FEBRUARY 28, 2018


Before:      JACOBS, RAGGI, and DRONEY, *Circuit Judges*.

Marleny Hernandez petitions for review of a precedential decision of the Board of Immigration Appeals ("BIA") finding her ineligible for asylum under the Immigration and Nationality Act ("INA") on the ground that she provided "material support" to a terrorist organization, notwithstanding that she acted under duress.   See 8 U.S.C. §§ 1158(b)(2)(A)(v), 1182(a)(3)(B)(i)(I), ll82(a)(3)(B)(iv)(VI).   A 2014 Summary Order of this Court identified no error in the BIA's conclusion that Hernandez provided material support to a terrorist organization, but the Order remanded for the BIA to determine in the first instance whether the so-called "material support bar," which makes no explicit mention of duress, nevertheless has an *implied* duress exception that might exempt Hernandez.   See Hernandez v. Holder, 579 F. App'x 12, 15 (2d Cir.

2014).    The principal question presented by this petition is whether the agency's determination on remand that the material support bar contains no such exception is entitled to deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).    We conclude that Chevron deference is warranted and join several other circuits in holding that the material support bar does not except aliens who acted under duress.    We also reject the petitioner's argument that aliens who are rendered ineligible for relief from removal by the material support bar have a due process right to some means of obtaining an exemption based on duress, other than the currently-available procedure for obtaining a discretionary waiver from the Department of State or the Department of Homeland Security.    See 8 U.S.C. § 1182(d)(3)(B)(i). Accordingly, we deny the petition.

Judge Droney concurs in the opinion of the Court and files a concurring opinion.

GREGORY SILBERT (*with* Kevin Meade and Melanie Conroy *on the brief*), Weil, Gotshal & Manges LLP, New York, NY and Boston, MA; Anne Pilsbury and Heather Yvonne Axford, Central American Legal Assistance, Brooklyn, NY, *for Petitioner*.

JEFFREY L. MENKIN, Senior Counsel for National Security, Office of Immigration Litigation (*with* Chad A. Readler, Acting Assistant Attorney General, and Ethan B. Kanter, Deputy Chief, *on the brief*), United States Department of Justice, Washington, D.C., *for Respondent*.

DENNIS JACOBS, *Circuit Judge*:

Petitioner Marleny Hernandez, a native and citizen of Colombia, seeks review of a June 9, 2016 published decision of the Board of Immigration Appeals ("BIA") finding her ineligible for asylum on the ground that she provided "material support" to a terrorist organization, notwithstanding that she acted under duress.   See Matter of M-H-Z-, 26 I. & N. Dec. 757 (B.I.A. 2016).

The Immigration and Nationality Act ("INA") deems ineligible for asylum any alien who has "engaged in a terrorist activity."   8 U.S.C. §§ 1158(b)(2)(A)(v), 1182(a)(3)(B)(i)(I).   In a provision known as the "material support bar," the INA defines "[e]ngag[ing] in [a] terrorist activity" to include committing an act that "the actor knows, or reasonably should know, affords material support" to a terrorist organization.   Id. § 1182(a)(3)(B)(iv)(VI).   A 2014 Summary Order of this court identified no error in the BIA's conclusion that Hernandez provided material support to a terrorist organization by providing the Revolutionary Armed Forces of Colombia $100 packages of foodstuffs every three months for more than two years.   See Hernandez v. Holder, 579 F. App'x 12, 15 (2d Cir. 2014).   But the Order remanded the matter for the BIA to determine in the first instance whether the material support bar, which makes no explicit mention of duress, nevertheless has an *implied* duress exception that might exempt Hernandez.   See id. (citing Ay v. Holder, 743 F.3d 317, 320 (2d Cir. 2014) (explaining that the material support bar is "silent on the question" of whether "a duress exception is implicit in its terms")).   The agency decision resulting from that remand is the subject of the petition before us.

The principal question presented by the petition is whether the agency's determination that the material support bar contains no implied duress exception is entitled to deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).   We conclude that Chevron deference is warranted and join several other circuits in holding that the material support bar does not except aliens, like Hernandez, who acted under duress.[1]   We also reject

--------

[1]  While this opinion discusses the material support bar in the context of Hernandez's claim for *asylum*, the bar--and the interpretation of it discussed in

3

Hernandez's argument that aliens who are rendered ineligible for relief from removal by the material support bar have a due process right to some means of obtaining an exemption based on duress, other than the currently available procedure for obtaining a discretionary waiver from the Department of State or the Department of Homeland Security--a waiver that Hernandez sought but did not receive.   See 8 U.S.C. § 1182(d)(3)(B)(i).   Accordingly, we deny the petition.

The facts and procedural course of this case are set out in the BIA's published decision and in our 2014 Summary Order.   We review only the BIA's decision issued on remand.   See Belortaja v. Gonzales, 484 F.3d 619, 623 (2d Cir. 2007).

# I

The INA's material support bar, 8 U.S.C. § 1182(a)(3)(B)(iv)(VI), is construed by the BIA to have no implied exception for duress.   When, as here, the BIA construes "the statute which it administers," we apply the familiar principles of deference outlined originally in Chevron.   INS v. Aguirre-Aguirre, 526 U.S. 415, 424 (1999).   "At the first step" of the two-step Chevron framework, we "determine whether Congress has directly spoken to the precise question at issue," and if it has, we "give effect to [Congress's] unambiguously expressed intent . . . .   If, however, the statute [is] ambiguous . . . , we proceed to a second step of analysis to [determine] whether the agency's interpretation is reasonable," and if it is, "we must defer to it."   Adams v. Holder, 692 F.3d 91, 95 (2d Cir. 2012) (internal quotation marks and citations omitted).

The inquiry here begins at Chevron step two, because we have already concluded that the material support bar is ambiguous as to whether duress is an exception.[2]   See Hernandez, 579 F. App'x at 15 (citing Ay, 743 F.3d at 320).   At Chevron step two, we conclude that the BIA's construction of the material

this opinion--applies equally to claims for withholding of removal.   See 8 U.S.C. §§ 1231(b)(3)(B)(iv), 1227(a)(4)(B), 1182(a)(3)(B)(i)(I), ll82(a)(3)(B)(iv)(VI).

[2] Hernandez argues that the statutory language favors her reading unambiguously.   That argument is defeated by stare decisis and law of the case.

support bar is reasonable and therefore entitled to <u>Chevron</u> deference.   In doing so, we join several of our sister circuits in holding that the material support bar does not contain an implied duress exception.   See <u>Sesay v. Att'y Gen.</u>, 787 F.3d 215, 217-18 (3d Cir. 2015); <u>Barahona v. Holder</u>, 691 F.3d 349, 355-56 (4th Cir. 2012); <u>Annachamy v. Holder</u>, 733 F.3d 254, 260, 267 (9th Cir. 2013), <u>overruled on other grounds by</u> <u>Abdisalan v. Holder</u>, 774 F.3d 517 (9th Cir. 2014) (en banc); <u>Alturo v. U.S. Att'y Gen.</u>, 716 F.3d 1310, 1314 (11th Cir. 2013).

Hernandez argues that the BIA's construction is not reasonable in view of **(1)** the context, purpose, and legislative history of the INA; **(2)** United States treaty obligations; and **(3)** the availability of a duress defense in criminal proceedings.   For the reasons that follow, we reject these arguments.

**1.**   The BIA reasonably determined that the nonexistence of a duress exception can be inferred from the language and design of the INA as a whole. See <u>Adams</u>, 692 F.3d at 95.   The text of the material support bar itself is "silent" as to conduct taken under duress.[3]   See <u>Ay</u>, 743 F.3d at 320.   Elsewhere in the INA, the bar to relief from removal for members or affiliates of communist or totalitarian political parties contains an explicit exception for individuals who can establish that their "membership or affiliation is or was involuntary."   8 U.S.C. § 1182(a)(3)(D)(i)-(ii).   The omission of such an express exception in the material support bar supports the inference drawn by the BIA that no exception was intended.   See <u>INS v. Cardoza-Fonseca</u>, 480 U.S. 421, 432 (1987) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks and citation omitted)).   Other circuits agree.   See <u>Alturo</u>, 716

---

[3] Hernandez argues that the bar's text, which states that it applies to aliens who "commit [] act[s]" that provide material support to terrorists, presumes deliberate conduct.   The point does not support her petition, however, because deliberate conduct may be taken under duress.   See <u>Dixon v. United States</u>, 548 U.S. 1, 6 (2006) (observing, in the criminal context, that the duress defense may excuse conduct that would otherwise be punishable for satisfying all elements of the offense).

F.3d at 1314 (observing that the lack of an explicit duress exception in the material support bar "stands in marked contrast to a neighboring provision in the INA that includes an explicit involuntariness exception for aliens who have been affiliated with a totalitarian party"); Annachamy, 733 F.3d at 261 (same); Sesay, 787 F.3d at 222-23 (same).[4]

The BIA likewise relied on the separate INA provision under which an alien who "has not *'voluntarily and knowingly'* supported terrorist activities" may apply for a discretionary "waive[r] [] of the material support bar" from "the Secretary of State or [] the Secretary of Homeland Security"--a waiver that requires inter-agency consultation.[5] Ay, 743 F.3d at 321 (emphasis added) (quoting 8 U.S.C. § 1182(d)(3)(B)(i)). In enacting that provision--"well after [enacting] the material support bar"--"Congress demonstrated its ability to distinguish between voluntary and involuntary" conduct in the INA. Matter of M-H-Z-, 26 I. & N. Dec. at 761 n.4; see also Sesay, 787 F.3d at 223-24 ("Given that the 2007 Amendments discussed duress waivers and voluntariness, and required reporting on persons removed for having provided material support under duress, Congress clearly legislated on the premise that the material support bar otherwise applied to support given under duress."); Annachamy, 733 F.3d at 262 n.8 ("Although the waiver provision was not enacted until 15 years after the

---

[4] In urging otherwise, Hernandez observes that the so-called "totalitarian bar" was enacted years before the material support bar by a different Congress. However, we "assume that Congress is aware of existing law when it passes legislation." Miles v. Apex Marine Corp., 498 U.S. 19, 32 (1990) (citation omitted). Indeed, presuming congressional awareness is "particularly appropriate here," because Congress updated the totalitarian bar "in the same legislation in which it created the material support bar." Annachamy, 733 F.3d at 261 n.7.

[5] The Secretary of State may exempt an applicant after consulting with the Attorney General and the Secretary of Homeland Security, and the Secretary of Homeland Security may do so after consulting with the Attorney General and the Secretary of State. See 8 U.S.C. § 1182(d)(3)(B)(i).

creation of the material support bar, the waiver provision is still relevant in determining the earlier congressional intent.").

**2.** Hernandez argues that a material support bar without an implied duress exception is incompatible with the non-refoulement obligation of the 1976 United Nations Protocol Relating to the Status of Refugees (the "Protocol"), to which the United States is a signatory. That argument appears to suggest that the Protocol is self-executing: it is not. See Yuen Jin v. Mukasey, 538 F.3d 143, 159 (2d Cir. 2008). In any event, the BIA recognized that the absence of an implied duress exception to the material support bar is consistent with the United States's obligations under the Protocol.

"The Protocol incorporates by reference Articles 2 through 34 of the [1951] United Nations Convention Relating to the Status of Refugees [(the 'Convention')]," Aguirre-Aguirre, 526 U.S. at 427, and Article 33.2 of the Convention provides that non-refoulement may not "be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is," Convention, art. 33.2, reprinted in 19 U.S.T. 6223. Moreover, "the determination of refugee status under the 1951 Convention and the 1967 Protocol . . . is incumbent upon the Contracting State in whose territory the refugee finds himself." Cardoza-Fonseca, 480 U.S. at 439 n.22 (quoting Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status 1 (ii) (Geneva, 1979)). Therefore, "[u]nder the Protocol and Convention, Congress is free to decide that an alien who provided material support to a terrorist organization, even if under duress, is a danger to the security of the United States." Annachamy, 733 F.3d at 266.

**3.** Hernandez argues that an implied duress exception to the material support bar is compelled by the pervasive availability of duress as a defense in the criminal law. However, a deportation proceeding "is not a criminal proceeding . . . [,] and the full trappings of legal protections that are accorded to criminal defendants are not [] constitutionally required in deportation proceedings." Dor v. Dist. Dir., INS, 891 F.2d 997, 1003 (2d Cir. 1989) (citation omitted). It was reasonable for the BIA to deem the criminal defense of duress

inapposite because ineligibility for relief from removal under the material support bar is not premised on criminal liability.   See Annachamy, 733 F.3d at 260 n.6 ("[An] alien's . . . [acts in] support [of a] . . . terrorist organization need not [give rise to] criminal[] liab[ility] for the material support bar to apply."); see also Negusie v. Holder, 555 U.S. 511, 526 (2009) (Scalia, J., concurring) (observing that the existence of the duress defense in criminal cases is irrelevant to the interpretation of a bar to relief from removal under the INA because an "order of deportation is not a punishment for a crime" (quoting Fong Yue Ting v. United States, 149 U.S. 698, 730 (1893))).

## II

Hernandez argues in the alternative that, given the BIA ruling, the discretionary waiver system authorized under 8 U.S.C. § 1182(d)(3)(B)(i) is the sole means by which an alien may obtain a duress exception to the material support bar, and that the government thus violates due process because that system does not afford aliens sufficient procedural safeguards.   See Burger v. Gonzales, 498 F.3d 131, 134 (2d Cir. 2007).

Aliens for whom the waiver system may later become necessary still have a full and fair opportunity to have their claims for asylum or withholding of removal first heard and adjudicated by an immigration judge and the BIA, see id., and it is through that adequate process that aliens may be deemed ineligible for relief if they are found to have provided material support to terrorists, see 8 U.S.C. § 1182(a)(3)(B)(iv)(VI).   The system that Hernandez challenges "afford[s] [these aliens] *additional* process," Yuen Jin, 538 F.3d at 157 (emphasis added), by allowing them to make a showing of involuntariness, which the Executive may, in its "sole [and] unreviewable discretion," deem deserving of a waiver, see 8 U.S.C. § 1182(d)(3)(B)(i).   However, aliens have no constitutionally-protected "liberty or property interest" in such a discretionary grant of relief for which they are otherwise statutorily ineligible.   See Yuen Jin, 538 F.3d at 156-57 (collecting cases); cf. Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005) ("[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion.").   There is therefore no merit to Hernandez's due

process challenge to either the denial of her waiver application or to the waiver system in general.

For the foregoing reasons, the petition for review is DENIED. Any stay of removal that the Court previously granted in this petition is VACATED, and any pending motion for a stay of removal in this petition is DISMISSED as moot.

DRONEY, *Circuit Judge*, concurring:

I agree that the material support for terrorism bar to asylum and withholding of removal does not contain a duress exception. I write separately to address whether the discretionary waiver to the material support bar complies with the obligations of the United States under international law, both in this case and more broadly. In my view, it is not clear that the waiver system meets these obligations without additional information from the Department of Homeland Security (DHS); indeed, I have serious concerns that it does not.

The United States is a signatory to the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. 6577 (1968) ("the Protocol"), which re-incorporated the main provisions of the U.N. Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150. Under the Protocol, signatory states may not deport an otherwise-eligible refugee or asylee unless the state has "reasonable grounds for regarding [the refugee] as a danger to security of the country in which he is." Protocol art. 33.2. This "national security exception" places limits on expelling individuals who can otherwise establish their eligibility for asylum by showing that their "life or freedom would be threatened on account of . . . race, religion, nationality, membership [in] a particular social group or political opinion" if returned to their country of origin. *Id.* art. 33.1. The government contends that the material support bar does not violate this restriction because the Protocol "did not define what constitutes a 'danger to the security of the country,' [and thus] it was left to Congress to set the parameters of that exclusion." Resp't Br. at 35. However, the treaty's language, as well as the statute and its legislative history, make clear that Congress did not intend to allow DHS to remove otherwise-eligible asylees who do not present genuine security threats to the United States—a description that seems very likely to apply to Hernandez, and perhaps, others like her.

First, the plain language and structure of the Protocol demonstrate that a state may expel only asylees who present true security threats to the United States. *See Swarna v. Al-Awadi*, 622 F.3d 123, 132 (2d Cir. 2010) ("In interpreting a treaty, it is well established that we begin with the text of the treaty and the context in which the written words are used." (alteration and internal quotation

marks omitted)). Specifically, the Protocol requires *reasonable* grounds to deem an individual a security threat. Protocol art. 33.2. The United Nations Handbook on Procedures and Criteria for Determining Refugee Status, which federal courts have often used to interpret the Protocol,[1] supports interpreting this clause to place significant restrictions on a signatory state's ability to deport otherwise-eligible asylees. *See* United Nations High Commissioner for Refugees (UNHCR), Handbook on Procedures and Criteria for Determining Refugee Status ¶¶ 140-63 (Geneva 1979) ("the Handbook"). The Court's opinion here cites the Handbook to support its conclusion that the determination of refugee status is left to signatories to the Protocol, slip op. at 7, but elsewhere the Handbook also specifies the limited conditions under which states may deny refugee status or expel a refugee, s*ee* UNHCR Handbook ¶¶ 140-63. In specifying these conditions, the Handbook indicates that a signatory state may expel an otherwise-eligible asylee only where that individual presents a serious threat to the country's security. *See also* UNHCR, Background Note on the Application of the Exclusion Clauses: Article 1F of the 1951 Convention Relating to the Status of Refugees 5 (Geneva 2003) ("Article 33(2) has always been considered as a measure of last resort, . . . justified by the exceptional threat posed by the individual—a threat such that it can only be countered by removing the person from the country of asylum."). The fact that the Protocol is not self-executing, *see Yuen Jin v. Mukasey*, 538 F.3d 143, 159 (2d Cir. 2008), does not mean that we may disregard the Protocol's language.[2]

---

[1] *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 438–39 (1987) ("In interpreting the Protocol's definition of 'refugee' we are further guided by the analysis set forth in the Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status (Geneva 1979).); *INS. v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999) (consulting Handbook to interpret Protocol).

[2] While the Protocol may permit states to determine how to implement its terms, the Protocol's text establishes a baseline for what constitutes a security risk serious enough to justify denying asylum to an otherwise-eligible applicant. Thus, this Court should look to these words in resolving the issues raised by this case. *See Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208

Second, domestic case law and Congress's actions support this interpretation of the Protocol. As the Supreme Court has noted, the United States codified its obligations under the Protocol when Congress passed the 1980 Refugee Act. *Sale v. Hatian Ctrs. Council, Inc.*, 509 U.S. 155, 177–78 (1993). Part of the Act incorporated Article 33.2's protection into U.S. law, using language virtually identical to that used in the Protocol. *See* 8 U.S.C. § 1231(b)(3)(B)(iv) (preventing a grant of withholding of removal where "there are reasonable grounds to believe that the alien is a danger to the security of the United States"). The Third Circuit has interpreted this "national security exception" to prevent removal unless there is probable cause to believe that an otherwise-eligible asylee poses an "actual" and "non-trivial" threat to national security. *Yusupov v. Att'y Gen.*, 518 F.3d 185, 201–04 (3d Cir. 2008); *see also id.* at 204 (noting that the language "'danger to the security of the United States' includes an inherent seriousness requirement").[3]

The question is whether the discretionary waiver system, as currently implemented, satisfies this standard. On the one hand, there is some basis to conclude that the waiver approach meets the Protocol's requirements and that Congress exercises meaningful oversight over the system to ensure compliance

(1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains . . . ."). Indeed, the Supreme Court has consulted the Protocol's text on various occasions to help interpret the meaning of the U.S.'s asylum and withholding of removal law. *See, e.g., Sale v. Hatian Ctrs. Council, Inc.*, 509 U.S. 155, 179–87 (1993); *Cardoza-Fonseca*, 480 U.S. at 438–39.

[3] *Yusupov* involved review of a case from the Attorney General that interpreted 8 U.S.C. § 1231(b)(3)(B)(iv). *Matter of A–H–*, 23 I. & N. Dec. 774 (2005). In that case, the Attorney General had similarly concluded that this section requires probable cause to believe that an individual *may* pose a non-trivial threat to national security. *Id.* at 788–89. Applying *Chevron* deference, the Third Circuit differed from the Attorney General only in that the Court determined an asylee must "*actually* pose a danger to the United States." *Yusupov*, 518 F.3d at 201 (emphasis added).

with its purpose and U.S. treaty obligations. In 2005, Congress amended the bar for "engaging in terrorist activities" to allow the Secretary of DHS to waive the bar in his or her sole discretion. *See* Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, Pub. L. No. 109-13, § 104, 119 Stat. 231, 309 (codified at 8 U.S.C. § 1182(d)(3)(B)). As part of that law, Congress mandated that the Secretary report to certain congressional committees regarding how frequently DHS invoked the discretionary authority. 8 U.S.C. § 1182(d)(3)(B)(ii). Using this authority, the Secretary created a waiver system for certain individuals who provided material support under duress. *See, e.g.*, Exercise of Auth. under Sec. 212(d)(3)(B)(i) of the Immigration and Nationality Act, 72 Fed. Reg. 26138-02 (May 8, 2007). In December 2007, Congress enacted additional reporting requirements regarding discretionary waivers for duress cases. *See* Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, § 691(e), 121 Stat. 1844, 2365. Congress acted in 2007 after many refugee and asylee advocates (as well as members of Congress) voiced concern about the implementation of the 2005 waiver authority and the material support bar's unfortunate consequences in many cases. *See The "Material Support" Bar: Denying Refuge to the Persecuted?": Hearing before the Subcomm. on Human Rights & the Law, Senate Comm. on the Judiciary*, 110th Cong. 1–186 (Sept. 19, 2007).

However, the facts of this case, the nature of the discretionary waiver process, and the limited public information available regarding the waiver prevent me from concluding that the waiver system necessarily complies with the Protocol; indeed, these issues leave me with serious concerns that at least in some cases, the waiver system does not comply with our treaty obligations and Congress's intent to create an effective waiver system. First, the record in Hernandez's case does not suggest that the United States faces an actual threat from this asylum applicant. There is no dispute that Hernandez was a "successful businesswoman" in Colombia who provided food to members of FARC[4] every three months for a period of two years following a series of FARC

---

[4] FARC is the Spanish acronym for the Revolutionary Armed Forces of Colombia, a guerilla organization at the center of Colombia's internal conflict for decades. *See* June S. Beittel, Cong. Research Serv., RL 43813, *Colombia: Background and U.S. Relations*, 2–8 (2017). FARC and the Colombian government signed a

threats against her. *Matter of M-H-Z*, 26 I. & N. Dec. 757, 758 (2016). However, in early 1999, Hernandez stopped providing assistance to FARC, and instead housed Colombian police officers in her hotel. Appellate Record 96. FARC once again began threatening Hernandez, and in March 2000, they attacked her hometown, burning down Hernandez's store and hotel. *Id.* Hernandez was later taken to see a FARC commander, who pointed a gun at her head, threatened her family, and ordered her to stop assisting "the police and politicians in her town." *Id.* at 97. After continuing to receive threats, Hernandez fled Colombia for the United States in 2001. *Id.* The U.S. government placed her in removal proceedings, and eventually, the immigration judge—following a full, contested hearing—determined "that, but for the material support bar, [Hernandez] would be eligible for asylum based on her past persecution by the FARC." 26 I. & N. Dec. at 759; Appellate Record 203.

Nothing about this undisputed history suggests that Hernandez is a security threat to this country. Indeed, DHS did *not* deny Hernandez a waiver on security grounds or express doubt that she had acted under duress. Rather, DHS denied her a waiver only because she failed to "fully disclose, in all relevant applications and interviews with U.S. Government representatives and agents, the nature and circumstances of each provision of material support." Pet'r Br. at 50, No. 11-31 (2d Cir.), ECF No. 90. This failure to disclose violated the DHS-created "threshold requirement" that a waiver applicant disclose certain information about the material support she provided in order to be eligible for a waiver. *See* 72 Fed. Reg. at 26138. Yet as I detailed above, under the Protocol, the United States may only deport an asylee based upon the security threat she presents to this country. [5]

---

peace accord in 2016, under which FARC has disarmed. *Id.* at 11, 13–15. However, these very recent developments occurred after the administrative record in this case was developed. *See* 8 U.S.C. § 1252(b)(4).

[5] Significantly, Hernandez is not alone, which increases my concerns. In the Third Circuit case addressing this issue, DHS denied a waiver to an individual who provided material support under duress to a rebel group in Sierra Leone by moving the group's equipment and goods. *Sesay v. Att'y Gen*, 787

This leads me to my second concern. In my view, the fact of Hernandez's denial—after the immigration judge determined that she was likely to face persecution if returned to Colombia—raises serious concerns that the discretionary waiver process is not effective given the few protections that the waiver process provides. *See Islam v. Gonzales*, 469 F.3d 53, 55 (2d Cir. 2006) (detailing procedural protections in formal removal proceedings). It may well be that a discretionary waiver system and its lack of administrative or judicial review best balances the need for our Executive Branch to safeguard national security while ensuring that some applicants who do not present a genuine security risk may obtain asylum and withholding of removal. For example, some cases might involve sensitive information about terrorist organizations such as ISIS that pose (or have posed) serious threats to U.S. national security. These cases may require secrecy of the waiver interviews and reasons for the waiver denials to protect sources or methods of overseas intelligence gathering. However, the need for such secrecy does not seem so clear in this case involving FARC, which has not presented a security threat to the United States for quite some time, if ever.[6]  As Hernandez's experience seems to suggest, in practice this discretionary waiver system also allows DHS to make its own credibility determinations, without the protections afforded in removal proceedings before the immigration court. *See* 72 Fed. Reg. at 26138; *see also Burger v. Gonzales*, 498 F.3d 131, 134-35 (2d Cir. 2007) (noting procedural protections in asylum and withholding of removal).

---

F.3d 215, 217–18 (3d Cir. 2015); *id.* at 223 n.7. The individual provided this support after repeatedly refusing to join the group as a rebel and after imprisonment and repeated beatings. *Id.* at 218. Similarly, in the Fourth Circuit's case addressing this issue, an asylum applicant permitted FMLN guerillas in El Salvador to use his house for cooking after the FMLN previously killed the applicant's father and cousin. *Barahona v. Holder*, 691 F.3d 349, 351-52 (4th Cir. 2012). DHS also denied a waiver in that case. *Id.* at 355 n.8.

[6] *See* Beittel, *Colombia: Background and U.S. Relations* at 2–8, 11, 13–15 (summarizing the history of Colombia's internal conflicts and recent developments).

DHS's regulations and the limited information available on the waiver process underscore these procedural concerns. As mentioned above, to obtain the waiver, an applicant must "[p]ose[] no danger to the safety and security of the United States." 72 Fed. Reg. at 26138. This requirement essentially concedes that many individuals to whom the material support bar applies are not an "actual" and "non-trivial" threat to U.S. national security. *Yusupov*, 518 F.3d at 201–04. Absent a grant of a discretionary waiver, denying these non-dangerous applicants asylum or withholding would violate the terms of the Protocol (so long as there are no other grounds for denial). *See id.*; Protocol Art. 33.2. Furthermore, the current waiver process does not appear to provide a "full and fair opportunity [for an applicant] to present her claims" or to respond to the government's reasons for denying the waiver. *Burger*, 498 F.3d at 134. An agency memorandum providing internal guidance to the agency provides some structure to this process, but also suggests that the applicant's only participation in the waiver process takes place in an interview focused on the details of the applicant's material support. *See* Memorandum of Jonathan Scharfen, Deputy Director, to DHS Officials (May 24, 2007), https://hsdl.hsdl.org/?view&did=21273.

Finally, the limited public statistics available to evaluate the waiver system further underscore my concerns and those of the panel in *Ay v. Holder*, 743 F.3d 317, 321 (2d Cir. 2014). For example, in fiscal year 2014—the only year with publicly available data—DHS processed only nineteen waivers for asylum applicants in the United States.[7] U.S. Citizenship & Immig. Servs., Report on the Secretary's Application of the Discretionary Authority Contained in Sec. 212(d)(3)(B)(i) of the INA 2 (2015).[8] Of these, DHS provided only four waivers

---

[7] Many more waivers were processed for refugees outside the United States.

[8] At oral argument, the government indicated that this report—which only contains information on the number of waivers granted—was not originally intended to be publicly available. According to the government, an outside organization obtained and released a copy of the report. The report is now available on the Internet.

for material support provided under duress to Tier I or Tier II terrorist organizations—the category into which FARC falls. Without more information (e.g., how many individuals in asylum proceedings DHS considers each year for a waiver), these results are difficult to assess. Nevertheless, the fact that DHS awards few waivers for asylum cases raises concerns that the process may be inadequate to comply with the Protocol. In light of each of these concerns, I join the other members of this Court who have observed that "the relief that [the discretionary] waiver offers appears to be limited," *Ay*, 743 F.3d at 321; indeed, it is possible that the relief may be so limited that it does not comply with the Protocol in certain cases.

Nothing in this case suggests that Hernandez represents a genuine threat to U.S. national security. Perhaps DHS has information demonstrating otherwise, and perhaps the waiver system ensures compliance with international law in every case. Courts would need additional information to reach the conclusion that the material support bar complies with the Protocol's requirements. Here, all the administrative record reflects is a Colombian businesswoman who acted under extreme fear and duress to protect her life and her family's life by providing foodstuffs to a guerilla organization located only in the highlands of Colombia. This same woman also assisted the Colombian police, the very people FARC often targeted. Indeed, DHS's denial of Hernandez's waiver did not even suggest she is an actual security threat. If she is in fact not a threat, then I would urge the government to reconsider Hernandez's denial—to ensure that this case and others comply with the U.S.'s international obligations under the Protocol.