**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 17-1176
_____

A.A.,
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES OF
AMERICA,
Respondent

_____

On Petition for Review of a Final Order
of the Board of Immigration Appeals
Agency Number: A208-056-809
Immigration Judge: Mirlande Tadal

_____

Argued: October 15, 2019
_____

Before: CHAGARES, JORDAN, and RESTREPO, Circuit
Judges

(Filed: September 2, 2020)

Anwen S. Hughes **[ARGUED]**
Human Rights First
75 Broad Street
Floor 31
New York, NY 10004

    Counsel for Petitioner

Joseph H. Hunt
Ethan B. Kanter
Paul F. Stone **[ARGUED]**
Office of Immigration Litigation, Appellate Section
United States Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

    Counsel for Respondent

_____

OPINION OF THE COURT
_____

CHAGARES, Circuit Judge.

A.A. is a Syrian citizen and national who fled involuntary military service in a government-controlled militia called Jaysh al-Sha'bi (the "Militia") and sought refuge in the United States. Upon arriving at New York's John F. Kennedy International Airport, A.A. gave himself up to United States Customs and Border Protection and applied for asylum,

withholding of removal, and deferral of removal under the Convention Against Torture ("CAT").

An Immigration Judge ("IJ") granted A.A.'s application for deferral of removal under the CAT because the IJ found that A.A. was likely to be tortured if he returned to Syria. But the IJ denied A.A.'s applications for asylum and for withholding of removal. The IJ determined that the Militia is a "Tier III," or "undesignated," terrorist organization under 8 U.S.C. § 1182(a)(3)(B)(vi)(III) (the "Tier III provision") because it is "a group of two or more individuals . . . which engages in [terrorist activity]" as defined in the Immigration and Nationality Act ("INA"). Any alien who provides "material support" to a Tier III organization is statutorily barred from receiving asylum and withholding of removal. 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). The IJ concluded that A.A. provided material support to the Militia because, during the course of his service, A.A. trained to use an assault weapon, carried out guard duty, and performed errands for his superiors.

Although A.A. secured CAT protection, he pursued his applications for asylum and withholding of removal before the Board of Immigration Appeals ("BIA"). A.A. argued before the BIA that the Militia is beyond the scope of the Tier III provision because it is a state actor controlled by a foreign government. The BIA disagreed and dismissed A.A.'s appeal. A.A. makes the same argument in his petition for review. For the reasons that follow, we will deny the petition.

I.

A.A. was conscripted into the Syrian military in 2011. He initially refused to report for duty because he had heard that

the Syrian military was engaging in human rights violations while prosecuting the Syrian Civil War. A.A. was eventually captured by Syrian military police and forced into service. A.A. testified that the military conscription office sent him for various medical tests and examinations over the course of approximately one year. The examining doctors concluded that A.A. suffered from "a chronic infection in the middle ear" and that he should be assigned to "stationary services" rather than active service. Administrative Record ("A.R.") 92. He was assigned to the Militia, which "is controlled by the Syrian government,"[1] Gov't Br. 5 (citing A.R. 1793), and which has "been instrumental in the Assad regime's campaign of terror and violence against the citizens of Syria," id. 5–6 (quoting A.R. 1792).

A.A. testified that, despite the doctors' medical assessment, the Militia put A.A. through basic training, where he learned how to use an AK-47 rifle. He was first assigned to guard duty at a power station, then transferred to a soccer field in Damascus, and later reassigned to Tishreen Stadium in Al-Bariqah. At each duty station, A.A. served as an unarmed guard and performed errands for his superiors, who physically

---

[1] Both parties agree that the Militia is controlled by the Syrian government. See A.A. Br. 4–5 ("There is no dispute . . . that [the Militia] was a Syrian state actor and under the control of the Syrian government." (citing A.R. 18)); Gov't Br. 5 ("Jaysh Al-Sha'bi is a militia controlled by the Syrian government." (citing A.R. 1793)). Neither party addresses whether a foreign government's control (and what degree of control) is sufficient to make an entity a "state actor." We assume, without deciding, that the Militia is controlled by the Syrian government and is a state actor.

and verbally abused him because A.A. repeatedly reminded them that he was only fit for stationary, non-active service.

A.A. testified that, while at Tishreen Stadium, he suffered a "nervous breakdown" and was hospitalized. A.R. 1985. He obtained a one-year medical discharge effective January 1, 2013. Fearing that he would be forced to re-join the Militia or another armed group after his temporary discharge expired, A.A. fled Syria in September or October of 2013 and eventually arrived in the United States.

A.A. was placed in expedited removal proceedings. On September 30, 2019, he passed his credible fear interview. On the same date, he received a Notice to Appear charging that he was inadmissible to the United States. Before an IJ, A.A. conceded inadmissibility under 8 U.S.C. § 1182(a)(7)(A)(i)(I) (lack of documentation required for admission) and applied for asylum, withholding of removal, and deferral of removal under the CAT.

The IJ granted A.A.'s application for deferral of removal under the CAT but denied his applications for asylum and for withholding of removal. The IJ noted that the Government submitted evidence that the Militia is "controlled by the Syrian government"; "has conducted . . . operations with [the] Syrian military"; and has "been instrumental in the Assad regime's campaign of terror" against the Syrian people. A.R. 106 (quotation marks omitted). The IJ also noted that the Militia receives support from Iran and that the Treasury Department has blocked the Militia's assets. The IJ credited A.A.'s testimony about the Militia's use of "abusive and violent military tactics." A.R. 106. A.A. testified that he saw reports about government soldiers killing civilians and that he

5

heard a story about military police persecuting the family of a deserter, including raping and murdering members of the deserter's family.

The IJ determined that the Militia's killing and injuring opposition members and use of terror and violence against Syrian civilians constituted "terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)(I)–(VI). As a result, the IJ concluded that the Militia "constitutes a Tier III terrorist organization." A.R. 106. The IJ further found that A.A. provided "material support" to the Militia through his military service, including taking part in weapons training, performing guard duties, and providing food and laundry services to superior officers. A.R. 106–08. The IJ held that A.A.'s provision of material support to a terrorist organization rendered him statutorily ineligible for asylum and withholding of removal. A.A. appealed to the BIA.[2]

On December 30, 2016, the BIA dismissed A.A.'s appeal in an unpublished decision by a single member. A.A. did not challenge the IJ's determination that the Militia engaged in terrorist activity or that he had provided the Militia with material support. Instead, A.A. argued that the Militia cannot be a Tier III organization because it is a state actor. The BIA rejected this argument. It agreed with the IJ that, to be a Tier III organization, an entity need only be "a group of two or more individuals, whether organized or not, which engages in,

_____

[2] Although A.A. was granted deferral of removal under the CAT and therefore cannot be removed to Syria at this time, this form of relief is more restrictive than asylum or withholding of removal under the INA. A.A. points out, for example, that he is ineligible to receive a travel document.

6

or has a subgroup which engages in" terrorist activity. A.R. 3 (quoting 8 U.S.C. § 1182(a)(3)(B)(vi)(III)). The BIA concluded that the Militia "is a group of two or more individuals," which engages in "terrorist activity"; that A.A. provided material support to the Militia; and that nothing in the relevant provisions of the INA limited the material support bar to non-state actors. A.R. 3–5 (quoting 8 U.S.C. § 1182(a)(3)(B)(vi)(III)).

On January 20, 2017, A.A. filed a petition for review. Proceedings were held in abeyance while United States Citizenship and Immigration Services ("USCIS") considered whether to grant A.A. a discretionary duress exemption from the material support bar because A.A. was forced to serve in the Militia. USCIS later issued a decision declining to grant A.A. a duress exemption.

II.

We have jurisdiction under 8 U.S.C. § 1252(a). The BIA had jurisdiction to review the IJ's decision under 8 C.F.R. § 1003.1(b)(3). A.A. timely filed this petition for review within thirty days of the BIA's decision, see 8 U.S.C. § 1252(b)(1), and the IJ completed proceedings in Elizabeth, New Jersey, so venue is proper, id. § 1252(b)(2).

Where, as here, the BIA adopted the findings of the IJ and discussed some of the bases for the IJ's decision, we review both decisions. Saravia v. Att'y Gen., 905 F.3d 729, 734 (3d Cir. 2018). A.A.'s petition for review is based on an issue of law, over which we exercise plenary review. Id.

7

The BIA's legal determinations involving the INA are entitled to deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). See Mahn v. Att'y Gen., 767 F.3d 170, 173 (3d Cir. 2014). Here, however, "Chevron deference is inappropriate because we are asked to review an unpublished, non-precedential decision issued by a single BIA member." Id. As a result, the BIA's decision is, "[a]t most," entitled only to deference based on its persuasive authority. Id. (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

## III.

A.A. argues that Congress never intended the Tier III provision "to extend the concept[s] of a terrorist organization[,] and of 'material support' to a terrorist organization[,] to the military forces and governments of foreign states." A.A. Br. 8. For support, A.A. advances a series of arguments based on the text of the Tier III provision; the structure, context, and revision history of the INA; the executive branch's own policies and past abstention from designating government-controlled entities as terrorist organizations; and the United States' treaty obligations. We address each argument in turn, and we conclude that each is unavailing.

## A.

## 1.

We begin with relevant legal background. Pursuant to the INA, "an alien seeking asylum must demonstrate either (i) proof of past persecution, or (ii) a well-founded fear of future persecution in his home country 'on account of race, religion,

8

nationality, membership in a particular social group, or political opinion.'" Sesay v. Att'y Gen., 787 F.3d 215, 218–19 (3d Cir. 2015) (quoting 8 U.S.C. § 1101(a)(42)). A well-founded fear of persecution entitles an applicant to asylum unless an exception applies. See id. at 219.

An alien's "application for withholding of removal is reviewed under a more stringent standard." Id. For withholding of removal, "an alien 'must establish a clear probability, that is, that it is more likely than not that [his] life or freedom would be threatened if returned to [his] country' because of his protected class." Id. (alterations in original) (quoting Kaita v. Att'y Gen., 522 F.3d 288, 296 (3d Cir. 2008)).

The INA contains several exceptions to the mandatory rules governing asylum and withholding of removal. As relevant here, 8 U.S.C. § 1182(a)(3) provides "[s]ecurity and related grounds" for deeming an alien inadmissible, and § 1182(a)(3)(B) specifically provides for terrorism-related inadmissibility grounds. Even if an alien is otherwise "eligible for relief, he will be deemed inadmissible and ineligible for asylum or withholding of removal if he has engaged in terrorist activities, including the provision of material support for terrorist groups." Sesay, 787 F.3d at 219 (citing 8 U.S.C. §§ 1158(b)(2)(A)(v), 1182(a)(3)(B)(i)(I), 1231(b)(3)(B), and 1227(a)(4)(B)).

An alien is not entitled to asylum or withholding of removal if "there are reasonable grounds to believe that [an] alien is a danger to the security of the United States." 8 U.S.C. § 1231(b)(3)(B)(iv). Further, "an alien who is described in section 1227(a)(4)(B) of this title shall be considered to be an

9

alien with respect to whom there are reasonable grounds for regarding as a danger to the security of the United States." Id. Section 1227(a)(4)(B), in turn, provides that any alien who is described in § 1182(a)(3)(B) (defining "terrorist activities") and (F) is removable. So, an alien described in § 1182(a)(3)(B) is not entitled to asylum or withholding of removal and is removable. See McAllister v. Att'y Gen., 444 F.3d 178, 188 (3d Cir. 2006) ("[A]n alien is not eligible for asylum if the Attorney General determines 'there are reasonable grounds for regarding the alien as a danger to the security of the United States,' or that 'the alien is described in . . . section 1227(a)(4)(B) . . . .'" (quoting 8 U.S.C. § 1158(b)(2)(A)(iv)–(v)).

Section 1182(a)(3)(B)(iv) defines the term "engage in terrorist activity," which includes "to commit an act that the actor knows, or reasonably should know, affords material support . . . to a terrorist organization described in [the Tier III provision]." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). This is commonly referred to as the "material support bar" because the alien's giving material support to a terrorist organization bars the person from admission to the United States.[3] See, e.g., Sesay, 787 F.3d at 220.

The Secretaries of State and Homeland Security have the power to exempt certain groups and individuals from

---

[3] The material support bar also applies where an alien provides material support to Tier I and Tier II organizations. See 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(cc).

10

§ 1182(a)(3)(B)'s national security inadmissibility grounds.[4] However, the Secretaries' exemption authority is subject to a number of statutory exceptions. <u>See</u> 8 U.S.C. § 1182(d)(3)(B)(i). And the Secretary of State may not exercise the exemption power with respect to an alien who is the subject of pending removal proceedings under § 1229a. <u>See</u> <u>id.</u>[5]

Since 2005, the Secretaries have announced exemptions in the Federal Register. There are two types of exemptions. "Group-based" exemptions cover classes of aliens, such as those deemed inadmissible because of their association with a particular Tier III organization. <u>See</u> Terrorism-Related Inadmissibility Grounds (TRIG), U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/laws-and-policy/other-resources/terrorism-related-inadmissibility-grounds-trig (last updated Nov. 19, 2019). "Situational exemptions" apply to aliens subject to certain inadmissibility grounds based on their individual conduct. <u>Id.</u> USCIS processes exemptions pursuant to the Secretaries' delegation of authority.

---

[4] The INA refers to these exemptions as "waivers," but they are commonly referred to as "exemptions" to distinguish them from waivers under § 1182(d)(3)(A). Gov't Br. 17–18.

[5] Removal proceedings conducted under 8 U.S.C. § 1229a commence with the filing of a Notice to Appear with the immigration court. 8 C.F.R. § 1239.1.

2.

The INA defines three types of "terrorist organizations" in 8 U.S.C. § 1182(a)(3)(B)(vi)(I) through (III).[6]   Clause (I)

---

[6] The full text of 8 U.S.C. § 1182(a)(3)(B)(vi) provides:

As used in this section, the term "terrorist organization" means an organization—

(I) designated under section 1189 of this title;

(II) otherwise designated, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in the activities described in subclauses (I) through (VI) of [§ 1182(a)(3)(B)(iv) (defining "engage in terrorist activity")]; or

(III) that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses

12

describes "Tier I" terrorist organizations that the Secretary of State formally designates according to the procedures set forth in 8 U.S.C. § 1189(a). Clause (II) describes "Tier II" terrorist organizations, which are also designated by the Secretary of State. Neither the Secretary of State nor the Secretary of Homeland Security may grant group-based exemptions to Tier I or Tier II terrorist organizations. See 8 U.S.C. § 1182(d)(3)(B)(i). However, the Secretary of State may still grant situational exemptions to individuals associated with Tier I and Tier II terrorist organizations.

Clause (III) describes "Tier III," or "undesignated," terrorist organizations. No executive agency formally designates Tier III organizations; rather, IJs or the BIA designate them on a case-by-case basis in the course of reviewing individual aliens' applications for immigration relief. As a result, an IJ's or the BIA's designation of a Tier III organization only impacts the alien whose case is before that IJ or before the BIA.

The Attorney General has the power to review IJ and BIA decisions designating Tier III organizations. See 8 U.S.C. § 1103(g)(2) ("The Attorney General shall . . . review such administrative determinations in immigration proceedings . . . as the Attorney General determines to be necessary."); 8 C.F.R. § 1003.1(h)(1) ("The [BIA] shall refer to the Attorney General for review of its decision all cases that . . . (i) The Attorney General directs the [BIA] to refer to him."). The Secretary of State and the Secretary of Homeland Security have the power

(I) through (VI) of [§ 1182(a)(3)(B)(iv)].

13

to grant group-based exemptions to Tier III organizations and situational exemptions to Tier III organization members, subject to some statutory exceptions. See 8 U.S.C. § 1182(d)(3)(B)(i) (barring, inter alia, exemptions for groups that have "purposefully engaged in . . . terrorist activity that is directed at civilians"). Unlike Tier I and Tier II organizations, aliens can avoid the immigration consequences of providing material support to a Tier III organization if they "did not know, and should not reasonably have known, that the organization was a terrorist organization." Id. § 1182(a)(3)(B)(iv)(IV)(cc), (VI)(dd).

3.

On April 24, 2019, after A.A. filed his opening brief and before the Government filed its response, the Secretary of State published a notice under his discretionary exemption power that exempts all subgroups of foreign governments from Tier III status. Office of the Secretary; Exercise of Authority Under the Immigration and Nationality Act, 84 Fed. Reg. 17230-01 (Apr. 24, 2019) (the "Exemption"). The Exemption provides, in relevant part:

> [The Tier III provision] shall not apply to any ministry, department, agency, division, or other group or sub-group within any foreign government; except that this exercise of authority shall not apply to any group designated under [8 U.S.C. § 1189] or any group prohibited from benefiting from an exercise of authority under [8 U.S.C. § 1182(d)(3)(B)(i)] for having engaged in terrorist activity against the United States or another democratic country, or having

14

purposefully engaged in a pattern or practice of terrorist activity that is directed at civilians. This waiver applies both retroactively and prospectively.

84 Fed. Reg. 17230-01. The three exceptions to the Exemption — (i) groups designated under 8 U.S.C. § 1189 (the Tier I organization provision); (ii) groups that engage in terrorist activity against the United States or another democratic country; and (iii) terrorist groups that target civilians — are dictated by 8 U.S.C. § 1182(d)(3)(B)(i). The Secretary of State has no power to exempt these groups.[7]

B.

First, A.A. argues that the Tier III provision does not include state actors because it only encompasses an "organization" that meets the Tier III criteria, and the INA's general definition of "organization" refers only to non-state actors. We disagree.

In interpreting a statute, "we must begin with the statutory text." United States v. Moreno, 727 F.3d 255, 259 (3d Cir. 2013) (citing United States v. Gonzales, 520 U.S. 1, 4

---

[7] We assume, without deciding, that the Militia is a terrorist group that "purposefully engage[s] in a pattern or practice of terrorist activity that is directed at civilians." 84 Fed. Reg. 17230-01. As a result, the Exemption cannot apply to A.A. Further, although the Exemption applies retroactively, § 1182(d)(3)(B)(i) prevents it from applying to aliens subject to pending removal proceedings. The Exemption cannot apply to A.A. for this reason as well.

15

(1997)). We "presume[] that Congress expresse[d] its intent through the ordinary meaning of its language," so "every exercise of statutory interpretation begins with an examination of the plain language of the statute." Murphy v. Millennium Radio Grp. LLC, 650 F.3d 295, 302 (3d Cir. 2011) (quoting Alston v. Countrywide Fin. Corp., 585 F.3d 753, 759 (3d Cir. 2009)). "[W]here the text of a statute is unambiguous," we will enforce it "as written," and we will only depart from that language based on "the most extraordinary showing of contrary intentions in the legislative history." Id. (quoting In re Phila. Newspapers, LLC, 599 F.3d 298, 314 (3d Cir. 2010)).

A.A. contends that the Tier III provision does not extend to state actors because the INA's general definition of "organization" applies to the prefatory language introducing the Tier III provision, and so that definition narrows the scope of the Tier III provision. Specifically, the prefatory language in § 1182(a)(3)(B)(vi) provides: "As used in this section, the term 'terrorist organization' means an organization" that fits the Tier I, II, or III organization criteria. Id. (emphasis added); see also 8 U.S.C. § 1101(a)(28) (defining "organization"). A.A. asserts that the INA definition of "organization" should apply to the phrase "an organization" in § 1182(a)(3)(B)(vi). Section 1101(a)(28)'s definition of "organization" provides: "The term 'organization' means, but is not limited to, an organization, corporation, company, partnership, association, trust, foundation or fund; and includes a group of persons, whether or not incorporated, permanently or temporarily associated together with joint action on any subject or subjects."

A.A. argues that this definition does not encompass state actors because it only consists of a list of terms that refer

16

to non-state actors, and therefore, the definition of "terrorist organization" must only encompass non-state actors as well. A.A. asserts that this is consistent with the dictionary definition of "organization," which also does not refer to state actors. A.A. Br. 13 (citing Organization, Merriam-Webster.com (defining "organization" as an "(a) association, society" or "(b) an administrative and functional structure, such as a business or a political party")). Finally, A.A. points out that the INA defines "foreign state" separately, and he argues that this is evidence that Congress did not intend for the definition of "organization" to encompass state actors. See A.A. Br. 13 (citing 8 U.S.C. § 1101(a)(14)).

The Government responds that the Tier III provision "neither expressly nor impliedly excludes militias" and "provides that an entity need only be 'a group of two or more individuals, whether organized or not.'" Gov't Br. 25 (quoting 8 U.S.C. § 1182(a)(3)(B)(vi)(III)). The Government asserts that this reading is consistent with the ordinary meaning of "group": "'a number of individuals assembled together or having some unifying relationship' and 'military unit[s].'" Gov't Br. 26 (quoting Group, Webster's Third New International Dictionary (1961)). So, because the Militia consists of a "group of two or more individuals," and nothing in the provision expressly excludes state actors, the Militia fits the definition of a Tier III organization. As a result, the Government contends, we need not address whether § 1101(a)(28)'s definition of "organization" modifies § 1182(a)(3)(B)(vi)'s definition of "terrorist organization."

However, the Government argues that even if we apply § 1101(a)(28)'s definition of "organization" to § 1182(a)(3)(B)(vi)'s definition of "terrorist organization,"

17

A.A.'s interpretation still fails. It reasons that, first, § 1101(a)(28) defines "organization" as "an organization," followed by additional terms, because Congress wanted the definition "to be broader than its commonly understood definition." Gov't Br. 29. Second, the definition is not exhaustive because it includes a catch-all modifier: "means, but is not limited to, an organization . . . ." Id. at 28 (quoting 8 U.S.C. § 1101(a)(28) (emphasis added)). Third, the definition of "organization" "includes a group of persons." Gov't Br. 28 (quoting 8 U.S.C. § 1101(a)(28) (emphasis added)). So, if the Militia is a "group" under the Tier III provision, then it is also an "organization" under § 1101(a)(28). Finally, the ordinary meaning of "organization" includes "a military command consisting of two or more units" and "a state or manner of being organized," both of which encompass the Militia. Gov't Br. 30 (quoting Organization, Webster's Third New International Dictionary (1961)).

We agree with the Government that the Tier III provision encompasses state actors, including the Militia. At the outset, A.A. alternately frames the issue before us as whether the Tier III provision encompasses "national military forces of foreign countries," A.A. Br. 1, and whether the Tier III provision applies to "state actors" more generally, A.A. Br. 9. The Government tries to limit the question to whether the Tier III provision encompasses state-controlled "militias." Gov't Br. 3, 31–32. Neither party presents any limiting principle for why a state-controlled "militia" is legally distinguishable in this context from any other state-controlled armed or unarmed group, and we perceive none. Therefore, we address the question of whether state actors generally can be designated as Tier III organizations.

18

The plain text of the Tier III provision answers the question before us: a Tier III terrorist organization is any "group of two or more individuals, whether organized or not" that "engage[s] in terrorist activity" as described in § 1182(a)(3)(B)(iv). The ordinary meaning of the term "group" includes "a number of individuals assembled together or having some unifying relationship" and "a military unit." Group, Webster's Ninth New Collegiate Dictionary (1986); Group, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/group (last visited Aug. 11, 2020) (same definition). The Militia is an organized military unit controlled by the Syrian government. It is a "a group of two or more individuals," united in a common purpose, that has "engage[d] in terrorist activity" as described in § 1182(a)(3)(B)(iv). So, by its plain meaning, the Tier III provision encompasses the Militia.

Even if we read § 1101(a)(28)'s definition of "organization" to apply to the Tier III provision, the result is the same. Once again, § 1101(a)(28)'s definition provides: "The term 'organization' means, but is not limited to, an organization, corporation, company, partnership, association, trust, foundation or fund; and includes a group of persons, whether or not incorporated, permanently or temporarily associated together with joint action on any subject or subjects." The definition is non-exhaustive, includes a catch-all modifier, and does not expressly exclude state actors. The ordinary meaning of "organization" is similarly expansive and in no way excludes state actors. See, e.g., Organization, Black's Law Dictionary (11th ed. 2019) ("A group . . . formed for a particular purpose."); Organization, Oxford English Dictionary, https://www.oed.com/view/Entry/132452 (last visited Aug. 11, 2020) ("An organized body of people with a

19

particular purpose, as a business, government department, charity, etc."). And as the Government points out, the definition of "organization" includes the term "group." So, if the Militia is a "group," then it must also be an "organization" under § 1101(a)(28). Finally, the fact that the INA includes a separate definition of "foreign state," without more, does not suggest that the definition of "organization" or the Tier III provision does not encompass state actors.

The ordinary meaning of the terms "group" and "organization" both include multiple individuals organized into military units. A.A. asks us to categorically exclude state actors from the scope of the Tier III provision and § 1101(a)(28)'s definition of "organization" based solely on the fact that the general definition of "organization" does not specifically refer to state actors. The plain text of these provisions simply does not support A.A.'s position.

## C.

A.A. next argues that the structure, context, and revision history of the INA is inconsistent with reading the Tier III provision to encompass state actors. Again, we disagree.

### 1.

A.A. contends that various amendments to the INA exhibit Congress's intent to treat state and non-state actors differently, at least with respect to the INA's terrorism provisions. A.A. points out that the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act") "eliminated from the definition of 'engage in terrorist

20

activity' . . . the reference to providing material support to 'any individual, organization or <u>government</u> in conducting a terrorist activity.'" A.A. Br. 17 (emphasis added) (citing USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 411, 115 Stat. 272, 346; 8 U.S.C. § 1182(a)(3)(B)(iii) (2000) (prior definition of "engage in terrorist activity")). Although A.A. does not mention it in his briefing, the USA PATRIOT Act also eliminated a reference to "terrorist government" in what was then § 1182(a)(3)(B)(iii)(V) (2000). A.A. argues that Congress excised these references to "government" because it intended to exclude state actors from the definition of "terrorist organization" in § 1182(a)(3)(B)(vi), and that Congress passed the USA PATRIOT Act to address the threat of terrorism from non-state actors. <u>See</u> A.A. Br. 23–26 (quoting statements by Senators Leahy, 147 Cong. Rec. S10990, S11014 (daily ed. Oct. 25, 2001), Graham, <u>id.</u> at S11017, Hatch, <u>id.</u> at S11016, and Kyl, <u>id.</u> at S11050, emphasizing the importance of addressing terrorist threats emanating from non-state actors).

The Government claims that Congress's elimination of the INA's references to "government" and "terrorist government" actually broadened the scope of the term "terrorist organization" "to 'account for the complex and often mutating nature of terrorist groups by expanding the class of inadmissible'" aliens. Gov't Br. 34 (quoting 147 Cong. Rec. S10990-2, S11016 (daily ed. Oct. 25, 2001) (statement of Sen. Hatch)). In the Government's view, the USA PATRIOT Act did nothing to narrow the terrorism-related inadmissibility provisions generally and did nothing to exclude state actors specifically.

We agree. A.A. focuses too narrowly on the USA PATRIOT Act's removal of references to "government" from

21

the definition of "engage in terrorist activity." That Act did much more than excise the word "government" from § 1182(a)(3)(B) — it completely overhauled the definition of "engage in terrorist activity," refining and expanding it, as well as adding the subsection that defines "terrorist organization." Moreover, a primary purpose of the Act was to broaden and deepen penalties for engaging in or supporting terrorist activity. See USA PATRIOT ACT of 2001, Pub. L. No. 107-56, 115 Stat. 272, 272 ("An Act [t]o deter and punish terrorist acts in the United States and around the world, to enhance law enforcement investigatory tools, and for other purposes."). Reading the Tier III provision to exclude state actors on the ground that the USA PATRIOT Act struck references to "government" and "terrorist government" would sharply cut against the broader purpose of the Act. Other than noting that the Act removed the term "terrorist government" from § 1182(a)(3), A.A. cannot point to any affirmative evidence that Congress intended to exclude state actors from the scope of the Tier III provision.

2.

A.A. also asserts that, if the Tier III provision encompasses state actors, then designating a state actor controlled by a foreign government as a Tier III organization effectively designates that entire foreign government as a terrorist organization. For support, A.A. points to the language of the Tier III provision, which encompasses "any organization of two or more persons, whether organized or not, that engages in or has a subgroup that engages in" terrorist activity. A.A. Br. 17 (citing 8 U.S.C. § 1182(a)(3)(B)(vi)(III)). According to A.A., under the subgroup clause, "unlawful violence by a country's" military forces, if "authorized" by the government,

22

"would turn the entire national government into a Tier III terrorist organization." A.A. Br. 18. A.A. implies that Congress could never have intended to empower IJs and the BIA to designate entire foreign governments as terrorist organizations.

The Government responds that the BIA's power to designate foreign governments as Tier III organizations should not impact the plain meaning of the Tier III provision. It asserts that the subgroup clause is further evidence that Congress desired to broaden the definition of "terrorist organization." In any case, the Government claims that the Secretary of State's Exemption for subgroups of most foreign governments "diminishes the impact of a determination" that such a subgroup is a Tier III organization. Gov't Br. 50 (citing 84 Fed. Reg. 17230-01).

A.A.'s arguments are unavailing. First, until an IJ or the BIA designates an organization as a Tier III organization, that organization is not covered by the Tier III provision, even if the provision's text appears applicable to it. And designating a subgroup as a Tier III organization does not infect the controlling, parent entity with the same label. See 8 U.S.C. § 1182(a)(3)(B)(vi)(III). So while the BIA had the power to designate the entire Syrian government as a Tier III organization based on the conduct of its subgroup, the Militia, the BIA did not do so. Instead, the BIA designated only the subgroup — the Militia itself — as a Tier III organization, and that designation does not apply to the Syrian government as a whole.

Second, at base — both here, and in other parts of his brief — A.A. argues that our interpreting the Tier III provision

23

in a way that permits IJs and the BIA to designate state actors as Tier III organizations will inject IJs and the BIA into the conduct of foreign policy, which is firmly the president's constitutional prerogative. A.A. asserts that Congress could not have intended such "absurd results." A.A. Reply Br. 1. The Government responds that Congress created the Tier III provision, delegated the power to make Tier III determinations to IJs and the BIA, and vested the Secretaries of State and Homeland Security with the power to exempt sub-entities of foreign governments from Tier III status — and if Congress wants to change that regime, it is free to do so.

Although "it is . . . a 'basic tenet of statutory construction . . . that courts should interpret a law to avoid absurd or bizarre results,'" Encompass Ins. v. Stone Mansion Rest. Inc., 902 F.3d 147, 152 (3d Cir. 2018) (second alteration in original) (quoting In re Kaiser Aluminum Corp., 456 F.3d 328, 338 (3d Cir. 2006)), our interpretation of the Tier III provision does not "def[y] rationality or render[] the statute nonsensical and superfluous," id. (quoting United States v. Moreno, 727 F.3d 255, 259 (3d Cir. 2013)). A.A.'s argument has surface-level appeal, but ultimately founders when examining the Tier III provision in the context of the INA as a whole.

The INA empowers the Secretaries of State and Homeland Security and the Attorney General to intervene in immigration proceedings to prevent absurd or bizarre results. As the Government points out, because the Exemption clearly applies to most subgroups of foreign governments, it will significantly narrow IJs' powers to apply the Tier III provision to foreign governments at all. See 84 Fed. Reg. 17230-01. And the Secretaries of State and Homeland Security can expand on

24

these exemptions if they deem it necessary to further the United States' international interests. See 8 U.S.C. § 1182(d)(3)(B). In any case, the Attorney General, and by extension, the President, retains ultimate control over BIA determinations. See id. § 1103(g)(2) ("The Attorney General shall . . . review such administrative determinations in immigration proceedings . . . as the Attorney General determines to be necessary . . . ."); 8 C.F.R. § 1003.1(d)(1)(i), 1003.1(h) ("The [BIA] shall refer to the Attorney General for review of its decision all cases that . . . (i) The Attorney General directs the [BIA] to refer to him."). These provisions empower executive branch officials to prevent Tier III designations that could have potentially sensitive foreign policy implications, and therefore, avoid the absurd or bizarre results that A.A. warns us against.

Finally, we note that the BIA already rules on issues that could impact the United States' relations with other countries. See, e.g., Matter of Vides Casanova, 26 I. & N. Dec. 494, 495, 501–02 (BIA 2015) (recognizing that the Salvadoran military and related militias were responsible for civilian killings and torture). And, at least in the past, the BIA has refrained from ruling on issues that go to the very heart of a foreign state's legitimacy. See, e.g., Matter of S-K-, 23 I. & N. Dec. 936, 940 (BIA 2006) (declining to "determine that a foreign sovereignty would not be recognized by the United States Government"). So our interpretation of the Tier III provision does not thrust IJs or the BIA into any unintended new or greatly expanded role of influence over American foreign policy.[8]

---

[8] A.A. similarly argues that applying the Tier III provision to state actors would force federal courts to rule on the legitimacy of foreign states. But, as the Government points out, federal courts already examine the conduct of foreign states in other

3.

A.A. further claims that applying the Tier III provision to state actors would render the extrajudicial killing and child soldier inadmissibility grounds superfluous. A.A. Br. 18–20 (citing Milner v. Dep't of the Navy, 562 U.S. 562, 575 (2011) (noting that courts should avoid interpreting statutes in ways that render provisions superfluous)).

The extrajudicial killing inadmissibility ground, enacted in 2004, bars aliens who have committed "under color of law of any foreign nation, any extrajudicial killing." 8 U.S.C. § 1182(a)(3)(E)(iii)(II). For comparison, according to A.A., the relevant portion of the terrorist activity inadmissibility ground bars aliens from immigration relief based on "[t]he use of any . . . (b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property." Id. § 1182(a)(3)(B)(iii)(V). A.A. thus argues that if the Tier III provision encompasses state actors, then it applies in any situation in which the extrajudicial killing

contexts, such as under the Foreign Sovereign Immunities Act, without issue. Gov't Br. 40–41 (citing 28 U.S.C. §§ 1605A (terrorism exception to the jurisdictional immunity of a foreign state), 1605B (responsibility of foreign states for international terrorism against the United States); Bank Markazi v. Peterson, 136 S. Ct. 1310, 1328 (2016) (holding that statute for enforcing judgments against foreign states does not violate separation of powers principles); Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 73–90 (D.D.C. 2010) (awarding damages against Iran based on its support for terrorism).

ground would apply. A.A. also notes that the extrajudicial killing ground targets state actors, and was enacted in 2004, after Congress created the Tier III provision.

The Government responds that actions can be "under the color of law even where [state officials] act without state sanction." Gov't Br. 53 (quoting Ramirez-Peyro v. Holder, 574 F.3d 893, 901 (8th Cir. 2009) (holding that the use of official authority does not require state sanction)); see also Kadic v. Karadžić, 70 F.3d 232, 245 (2d Cir. 1995) ("A private individual acts under color of law within the meaning of section 1983 when he acts together with state officials or with significant state aid.")). According to the Government, the alien "need not commit the act in association with an organization" and need not have "organizational authorization" for it. Gov't Br. 53 (citing Uddin v. Att'y Gen., 870 F.3d 282, 290 (3d Cir. 2017) (holding that "Tier III status cannot be assigned to a group" unless "the specified terrorist acts were actually authorized" by that group)). As a result, the Government contends, applying the Tier III provision to state actors would not result in the terrorism grounds swallowing the extrajudicial killing ground because the latter would apply where an alien commits a killing, under color of law, without authorization from the foreign state.

A.A. also argues that if state militaries can be Tier III organizations, then the child soldier inadmissibility ground would be superfluous. Enacted in 2008, the child soldier provision bars aliens who have "engaged in the recruitment or use of child soldiers." 8 U.S.C. § 1182(a)(3)(G). The Government responds that if a sovereign country used child soldiers in its military in otherwise legitimate armed combat, "that military would not be an undesignated terrorist

27

organization and the members of the organization would not be committing or supporting terrorism." Gov't Br. 54–55. In that situation then, the terrorism ground would not swallow the child soldier ground.

A.A.'s arguments are unpersuasive. The Government has identified plausible situations in which either the extrajudicial killing or child soldier inadmissibility ground could apply, and the terrorism inadmissibility grounds through the Tier III provision would not. As a result, neither the extrajudicial killing ground nor the child soldier ground would be made redundant by interpreting the Tier III provision to encompass state actors. Further, because Congress deliberately drafted the inadmissibility grounds broadly, invalidating or narrowing one ground because it overlaps with another would cut against Congress's intent. See, e.g., Uddin, 870 F.3d at 285 ("Terrorist activity is defined broadly by the statute . . . ."); Khan v. Holder, 584 F.3d 773, 777 (9th Cir. 2009) ("[T]he statute defines 'engag[ing] in terrorist activity' broadly. . . . The statute also defines 'terrorist organization' broadly."). It is not apparent from the reach of other inadmissibility grounds that Congress intended to carve out a safe harbor for state actors that otherwise meet the definition of a Tier III organization and whose conduct otherwise meets the definition of engaging in terrorist activity.[9]

_____

[9] A.A. also contends that "a group may be designated as a [foreign terrorist organization by the Secretary of State] under [8 U.S.C. § 1189] if it engages in terrorist activity as defined in [8 U.S.C. § 1182(a)(3)(B)] or terrorism as defined in 22 U.S.C. § 2656[f(d)(2)]." A.A. Br. 16 & n.2 (emphasis added). Section 2656f(d)(2) defines "terrorism" as "premeditated, politically motivated violence perpetrated against

28

D.

A.A. then argues that the executive branch's own actions cut against the Government's argument that the Tier III provision should apply to state actors. First, A.A. argues that terrorism law and policy treat state actors differently, so we should restrict the Tier III provision to non-state actors as a means of abiding by this general norm of differential treatment. A.A. specifically points to the United States' sanctions against Syria as evidence that it does not treat the Syrian government as a terrorist organization, but rather as a state sponsor of terrorism.

The Government responds that sanctions against state sponsors of terrorism are not the executive branch's exclusive means of punishing state actors that engage in terrorist activity. Sanctions are economic and targeted at states, whereas the INA's terrorist activity provisions impose immigration consequences on individuals. A terrorist organization designation under § 1182(a)(3)(B)(vi) only has consequences for the organization's members, not for the organization itself.

_____

noncombatant targets by subnational groups or clandestine agents." A.A. points to the term "subnational groups" as indicative of Congress's intent to target non-state actors. We are not persuaded. First, § 2656f(d)(2)'s definition of "terrorism" applies to Tier I designations under § 1189, not Tier III designations. Second, § 1189 provides that an entity can be designated a Tier I organization based on either 8 U.S.C. § 1182(a)(3)(B) or 22 U.S.C. § 2656f(d)(2). A.A. offers no reason why we should defer to § 2656f(d)(2)'s possibly more restrictive definition, and we see no reason to do so.

A.A. also argues that since the USA PATRIOT Act created the Tier III provision, neither the Department of Homeland Security ("DHS") nor the BIA has applied it to "the armed forces of a national government," or any other state actor. A.A. Br. 26. Instead, A.A. claims, in cases involving state actors, DHS has pursued the so-called persecutor bar. The persecutor bar is a statutory exception to the INA definition of "refugee." That exception provides: "The term 'refugee' does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(B). A.A. cites three decisions involving state actors where DHS pursued the persecutor bar but could have pursued the material support bar through the Tier III provision. See Negusie v. Holder, 555 U.S. 511 (2009) (involving a Eritrean military conscript); FH-T v. Holder, 723 F.3d 833 (7th Cir. 2013) (involving a former member of a Eritrean rebel movement who fled Eritrean national military service, where the material support bar was raised with respect to his time in the rebel movement but not his time fighting for the Eritrean state); Matter of J.M. Alvarado, 27 I. & N. Dec. 27 (BIA 2017) (involving an individual who served in the Salvadoran National Guard during the Salvadoran Civil War).

We disagree with A.A.'s argument. In enforcing the law, DHS has prosecutorial discretion to pursue (or not pursue) whatever combination of inadmissibility grounds that it chooses in enforcing the country's immigration laws. See, e.g., Heckler v. Chaney, 470 U.S. 821, 831 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."); Reno v. Am.-Arab Anti-

Discrimination Comm., 525 U.S. 471, 483–84 (1999) (noting the long history of executive branch discretion to pursue or abandon removal proceedings); Texas v. United States, 106 F.3d 661, 667 (5th Cir. 1997) (noting the State of Texas's concession that 8 U.S.C. § 1103, describing the powers of the Attorney General in immigration matters, "places no substantive limits on the Attorney General and commits enforcement of the INA to her discretion"). We see no reason why the Government's exercise of discretion to initiate removal proceedings based on one inadmissibility ground over another should impact the scope of the Tier III provision.

A.A. makes a similar argument that the Government has never classified a state actor as a Tier I or Tier II organization, and therefore, it would be incongruous to interpret the Tier III provision to encompass state actors. However, on April 15, 2019, after A.A. filed his opening brief and before the Government filed its response brief, the Secretary of State designated the Iranian Revolutionary Guard ("IRG") as a Tier I terrorist organization. See In the Matter of the Designation of the Islamic Revolutionary Guard Corps (and Other Aliases) as a Foreign Terrorist Organization, 84 Fed. Reg. 15278-01 (Apr. 15, 2019). And on April 24, 2019, the Secretary of State published the Exemption from Tier III status for subgroups of foreign governments. See Exemption, 84 Fed. Reg. 17230-01. The Government points to the Tier I designation of the IRG as evidence that the executive branch can and does designate state actors as terrorist organizations. And the Government claims that the Exemption "shows the executive branch consider[s] that groups and subgroups of any foreign government can be [Tier III] terrorist organizations." Gov't Br. 27. A.A. responds that the "Executive Branch's assertion of its ability to treat foreign governments and their agencies as Tier III terrorist

31

organizations . . . is not determinative of whether Congress ever gave it that authority." A.A. Reply Br. 3.

We are again unconvinced by A.A.'s argument. A.A. is correct that the executive's assertion of statutory authority is not determinative of whether it has such power. See Rucho v. Common Cause, 139 S. Ct. 2484, 2494 (2019) ("[I]t is 'the province and duty of the judicial department to say what the law is.'" (quoting Marbury v. Madison, 1 Cranch 137, 177 (1803))). However, the plain meaning of the Tier III provision encompasses state actors. See supra Part III.B. The Government has discretion to invoke one ground for removal over another. Its choices do not narrow the plain meaning of the Tier III provision, nor limit the Government's otherwise lawful powers.

E.

A.A. next claims that interpreting the Tier III provision to encompass state actors conflicts with the United States' treaty obligations under the Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 (the "Convention"), and the 1967 United Nations Protocol relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267 (the "Protocol"), which "[binds] parties to comply with the substantive provisions of Articles 2 through 34" of the Convention. Khan, 584 F.3d at 782 (alteration in original) (quoting INS v. Stevic, 467 U.S. 407, 416 (1984)). A.A. argues that the Protocol only permits exceptions to mandatory asylum for aliens for whom there are "reasonable grounds for regarding . . . as a danger to the security of the country where he is." A.A. Br. 40 (quoting Convention, Article 33(2)). A.A. asserts that Congress incorporated the Protocol into domestic

32

law through the Refugee Act of 1980 (the "Refugee Act"), which added language to § 1231(b)(3)(B)(iv) that reflects the language of Article 33(2). Section 1231(b)(3)(B)(iv) bars aliens from refugee status where there are "reasonable grounds to believe that the alien is a danger to the security of the United States." A.A. claims that more recently enacted terrorism provisions are refracted through this exception, and thus, the Protocol should guide our interpretation of § 1231(b)(3)(B) and § 1182(a)(3)(B), including the Tier III provision. Therefore, he argues, because certain inadmissibility grounds under § 1182(a)(3)(B) automatically create "grounds" "to believe that the alien is a danger to the security of the United States," those inadmissibility grounds destroy the "reasonable" requirement in § 1231(b)(3)(B)(iv) and Article 33(2).

We recognize that "one of Congress' primary purposes in passing the Refugee Act was to implement the principles agreed to in the [Protocol]." INS v. Aguirre-Aguirre, 526 U.S. 415, 427 (1999) (quotation marks omitted). But we ultimately conclude that the Protocol plays no role in our interpretation of the Tier III provision.

First, the Protocol is not self-executing; that is, it does not have any independent force absent implementing legislation. See Medellin v. Texas, 552 U.S. 491, 534 n.2 (2008) (Stevens, J., concurring) (citing a 1992 Senate declaration of non-self-execution with respect to the Protocol); United States v. Pinto–Mejia, 720 F.2d 248, 259 (2d Cir. 1983) ("[I]n enacting statutes, Congress is not bound by international law."); United States v. Merkt, 794 F.2d 950, 964 n.16 (5th Cir. 1986) (similar). Cf. Khan, 584 F.3d at 783 (discussing differences between United States law and the Protocol). Second, because the Protocol lacks independent force in

33

United States courts, we look to the text of the relevant statutes to determine what Congress intended. Even where one of Congress's purposes in enacting a law was to execute one of the United States' international obligations, courts are bound by the relevant statutes, not by sources of international law. See, e.g., id. at 784 (holding that the INA's definition of "terrorist activity" controls in asylum determinations). Section 1227(a)(4)(B) provides that an alien who is inadmissible under § 1182(a)(3)(B) is automatically considered to be an alien with respect to whom there are reasonable grounds for regarding as a danger to the security of the United States. See McAllister, 444 F.3d at 188. There is no evidence that Congress intended § 1227(a)(4)(B) to bind the United States to the terms of the Protocol, and the plain meaning of the Tier III provision clearly encompasses state actors, including the Militia.

IV.

The INA contains no statutory exception for individuals, like A.A., who are forced to provide material support to terrorist organizations. Sesay, 787 F.3d at 222–24 ("Congress has 'delegat[ed] to the Secretary the sole authority to waive the applicability of terrorist-related bars, . . . paid specific attention to duress waivers,' and 'has appreciated the distinction between voluntary and involuntary conduct.'" (quoting Annachamy v. Holder, 733 F.3d 254, 263–64 (9th Cir. 2013))). The only recourse for aliens forced to serve a terrorist organization and ensnared by the material support bar is a possible administrative duress exemption. A.A. was denied such an exemption. We asked the parties to submit supplemental briefing on how the exemption process works and why A.A. did not qualify for one.

34

Under 8 U.S.C. § 1182(d)(3)(B)(i), the Secretaries of State and Homeland Security "may determine in such Secretary's sole unreviewable discretion that subsection (a)(3)(B) shall not apply with respect to an alien within the scope of that subsection or that subsection (a)(3)(B)(vi)(III) shall not apply to a group within the scope of that subsection [subject to limitations]." In 2007, the Secretary of Homeland Security defined and implemented the duress exemption to the material support bar. Exercise of Authority Under Sec. 212(d)(3)(B)(i) of the Immigration and Nationality Act, 72 Fed. Reg. 9958-01 (Mar. 6, 2007). To receive a duress exemption, an alien must first satisfy four threshold requirements — that he or she:

> a) Is seeking a benefit or protection under the [INA] and [but for the material support bar] has been determined to be otherwise eligible for the benefit or protection;
> b) Has undergone and passed relevant background and security checks;
> c) Has fully disclosed, in all relevant applications and interviews with U.S. Government representatives and agents, the nature and circumstances of each provision of such material support; and
> d) Poses no danger to the safety and security of the United States.

Id. USCIS also "may . . . consider[]" the following factors: "whether the applicant reasonably could have avoided, or took steps to avoid, providing material support"; "the severity and type of harm inflicted or threatened, [and] to whom the harm was directed"; "the perceived imminence of the harm

35

threatened[,] and the perceived likelihood that the harm would be inflicted"; "the amount, type and frequency of material support provided, the nature of the activities committed by the terrorist organization, the alien's awareness of those activities, the length of time since material support was provided, the alien's conduct since that time, and any other relevant factor." Id. All of these factors are discretionary and, ultimately, USCIS decides whether or not to grant an exemption based on the "totality of the circumstances." Id.

USCIS will only consider whether an alien should receive an exemption after the alien's order of removal becomes final. See Department of Homeland Security Implements Exemption Authority for Certain Terrorism-Related Inadmissibility Grounds for Cases with Administratively Final Orders of Removal, U.S. Citizenship and Immigr. Servs. (Oct. 23, 2008), https://www.uscis.gov/sites/default/files/USCIS/Laws/TRIG/ USCIS_Process_Fact_Sheet_-_Cases_in_Removal_Proceedings.pdf (explaining the exemption process and exemption eligibility requirements). Cases "in which the applicant appears eligible for the benefit sought[,] but for the provision of material support[,] will be subject to two levels of review and concurrence with the adjudicating office's recommendation." USCIS Implementing Memorandum, Gov't Supp. Br. Ex. B, at 9. Further, USCIS headquarters retains "authority to review each application and will take appropriate steps to ensure agency-wide consistency in application of the discretionary exemptions." Id. There is no administrative appeals process, and exemption decisions are not subject to judicial review. 8 U.S.C. § 1182(d)(3)(B)(i) (exemptions granted in the "sole unreviewable discretion" of the Secretaries of State and Homeland Security),

36

§ 1252(a)(2)(D) (judicial review of final orders of removal limited to constitutional claims and questions of law).

A.A.'s removal order became administratively final on December 30, 2016. His case was then submitted to USCIS for evaluation. On December 18, 2018, USCIS declined to grant A.A. an exemption. USCIS concluded that A.A. failed to "fully disclose in all relevant applications and interviews . . . the nature and circumstances of each provision of material support to the" Militia. Notice of Determination, Gov't Supp. Br. Ex. C, at 3 (Dec. 18, 2018). USCIS noted that A.A. "initially lied about [his] travel pattern out of fear that [he] would have been immediately deported." Id. at 6. USCIS also noted that A.A. provided more comprehensive information to the immigration court than he did during his interview at the airport immediately after he arrived in the United States. Because of these purported inconsistencies and USCIS's uncertainty about the details of A.A.'s military service, and because A.A.'s "positive factors are insufficient to overcome the negative factors," USCIS refused to grant A.A. an exemption. Id. at 7. As a result, while the administrative duress exemption might have afforded A.A. the relief he desired, it ultimately did not, and A.A. has no right to judicial review of this decision.[10]

V.

For these reasons, we will deny A.A.'s petition for review.

---

[10] We have examined A.A.'s remaining arguments and have found them unavailing.

37